980 A.2d 935 (2009)
117 Conn.App. 710
In re G.S.[*]
No. 29890.
Appellate Court of Connecticut.
Argued September 3, 2009.
Decided October 27, 2009.
*937 David J. Reich, for the appellant (respondent mother).
Colleen B. Valentine, assistant attorney general, with whom, on the brief, were Richard Blumenthal, attorney general, and Susan T. Pearlman, assistant attorney general, for the appellee (petitioner).
GRUENDEL, BEACH and ALVORD, Js.
GRUENDEL, J.
This appeal underscores the sad distinction between willingness and ability to parent a child. The respondent mother appeals from the judgment of the trial court terminating her parental rights as to G, her minor child.[1] She contends that the court (1) erroneously found that the department of children and families (department) made reasonable efforts to reunify her with G, (2) failed to make that finding pursuant to the clear and convincing evidence standard and (3) erroneously found that she had failed to achieve a sufficient degree of personal rehabilitation pursuant to General Statutes § 17a-112(j)(3). We affirm the judgment of the trial court.
G was born on September 8, 2005. The respondent had an extensive history of substance abuse and exposed G to cocaine and ecstasy while in utero. Moreover, at the time of G's birth, the respondent was incarcerated at the York Correctional Institution in Niantic. As a result, the department immediately received a referral upon G's birth.
Days later, the petitioner, the commissioner of children and families, filed a neglect petition and a motion for an order of temporary custody. The latter motion was granted and subsequently sustained by agreement on September 16, 2005. The petitioner placed G in a foster home under the care of Glenda C., where she since has resided. On January 31, 2006, following a plea of nolo contendere by the respondent, G was adjudicated neglected and committed to the custody of the petitioner. A permanency plan thereafter was submitted, which called for reunification with the respondent. The respondent also *938 agreed to comply with certain specific steps ordered by the court to facilitate the return of G to her.[2]
By all accounts, the respondent complied with those steps. She consistently tested negative during random drug screenings. While incarcerated, she participated in the Marilyn Baker House substance abuse program offered at the York Correctional Institution. Upon her January 12, 2006 release therefrom, the respondent resided in a therapeutic shelter to continue her substance abuse efforts and began attending Narcotics Anonymous meetings. When the respondent left that shelter in May, 2006, the department referred her to the Morris Foundation intensive outpatient program, which provided substance abuse and mental health services. The respondent also met with a clinician at St. Mary's Behavioral Health Center, where she received medication management services. The department further referred the respondent to Nutmeg Family Services, LLC, which provided visitation services, parenting instruction and supervision from the time of the respondent's release from incarceration until trial in this matter. In January, 2007, the department referred the respondent to Family Services of Greater Waterbury, Inc., for an intensive family reunification program. The respondent participated in that three month program, albeit unsuccessfully.
In a letter dated April 27, 2007, the intensive family reunification worker, Sylvia Veronneau, informed the petitioner of her concerns that the respondent "is unable to parent by herself" and that she "hasn't shown much improvement or demonstrated strong parenting skills." Veronneau had supervised twenty-three hours of visitation between the respondent and G and noted that the respondent did not regularly engage the child, displayed poor time management, encountered difficulty in balancing nap time and feeding time, displayed erratic behavior from day to day and failed to take her medication for a bipolar disorder on a regular basis. The respondent was discharged from the intensive family reunification program soon thereafter, with the program recommending against reunification of the respondent and G.
The respondent similarly indicated that she was not prepared for reunification at that time. On April 25, 2007, she informed her social worker that "she is not ready for reunification with [G]. [The respondent] stated that she is worried about having her back with her [full-time]. [The respondent] acknowledged that when [G] comes for a visit she does not really know what to do and is exhausted when the visit is over. *939 [The respondent] reported [that] she does still want to work towards reunification, but does not feel she is ready yet." Likewise, the respondent on May 1, 2007, "informed her attorney in [the] presence of [her social worker] that she was not ready for reunification at this time." As a result of these developments, the fact that G had been in the care of the petitioner for twenty months and the fact that reunification appeared unlikely in the foreseeable future, the petitioner on July 31, 2007, submitted to the court a permanency plan for the termination of the respondent's parental rights. The petitioner further sought a psychological evaluation of the respondent, which the court granted. On August 28, 2007, the respondent moved to revoke commitment; the petitioner filed a petition for the termination of the respondent's parental rights on October 3, 2007. The motion to revoke commitment and the permanency plan were consolidated with the termination trial, which commenced on March 26, 2008. Nutmeg Family Services, LLC, continued to provide visitation services, parenting instruction and supervision until that time.
At trial, the court heard testimony from clinical psychologist Nancy Randall, Monique Mooney of Nutmeg Family Services, LLC, department worker Brenda Sheremeta, foster mother Glenda C. and the respondent. In addition, the parties introduced twenty-nine exhibits into evidence. In its April 17, 2008 memorandum of decision, the court concluded that the respondent had "failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, she could assume a responsible position in the life of the child" and further determined that termination of the respondent's parental rights was in G's best interest. The court thus granted the termination petition, approved the permanency plan and denied the respondent's motion to revoke commitment. From that judgment, the respondent appeals.

I
The respondent claims that the court erroneously found that the department made reasonable efforts to reunify her with G. We conclude that there was adequate evidence in the record to support the court's determination.
"In order to terminate parental rights under § 17a-112 (j), the department is required to prove, by clear and convincing evidence, that it has made reasonable efforts . . . to reunify the child with the parent, unless the court finds . . . that the parent is unable or unwilling to benefit from reunification. . . . [Section 17a-112] imposes on the department the duty, inter alia, to make reasonable efforts to reunite the child or children with the parents. The word reasonable is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof. Neither the word reasonable nor the word efforts is, however, defined by our legislature or by the federal act from which the requirement was drawn. . . . [R]easonable efforts means doing everything reasonable, not everything possible. . . . The trial court's determination of this issue will not be overturned on appeal unless, in light of all of the evidence in the record, it is clearly erroneous." (Citation omitted; internal quotation marks omitted.) In re Samantha C., 268 Conn. 614, 632, 847 A.2d 883 (2004). "A finding is clearly erroneous when either there is no evidence in the record to support it, or the reviewing court is left with the definite and firm conviction that a mistake has been made. . . . On appeal, our function is to determine whether the trial court's conclusion was factually *940 supported and legally correct. . . . In doing so . . . [g]reat weight is given to the judgment of the trial court because of [the court's] opportunity to observe the parties and the evidence. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [Rather] every reasonable presumption is made in favor of the trial court's ruling." (Citations omitted; internal quotation marks omitted.) Id., at 627-28, 847 A.2d 883.
In its memorandum of decision, the court found that the respondent "was offered substance abuse treatment, therapy, both individual and group, drug testing, visitation, both supervised and unsupervised, parenting education, psychological evaluation, in-home reunification services, housing assistance and transportation." That determination finds ample support in the record before us, which details the respondent's involvement in the following services provided by the department: the Marilyn Baker House substance abuse program at York Correctional Institution; Narcotics Anonymous; the Morris Foundation therapeutic shelter; the Morris Foundation intensive outpatient program providing substance abuse and mental health services; parenting instruction and supervision and visitation services with Nutmeg Family Services, LLC; an intensive family reunification program with Family Services of Greater Waterbury, Inc.; transportation; and a psychological evaluation. Significantly, the respondent in her appellate brief concedes that "the department did provide an array of services."[3] That concession belies her claim that the present case is akin to In re Vincent B., 73 Conn.App. 637, 809 A.2d 1119 (2002), cert. denied, 262 Conn. 934, 815 A.2d 136 (2003), a case in which this court overturned the termination of a father's parental rights because the department had made "no efforts at reunification at all." Id., at 645, 809 A.2d 1119.
The respondent's criticism of the department stems largely from the fact that she made a concerted effort to comply with the specific steps ordered and to avail herself of the services provided. For that effort, the respondent should be commended. At the same time, the ultimate measure in a termination proceeding is not whether the respondent complies with the various services provided but whether she benefits therefrom. In the present case, such benefit is absent. As her social worker testified, the respondent "has been compliant with the services, but she hasn't been able to learn the parenting skills that she needs in order to care for the child." Lamentably, motivation to parent is not enough; ability is required. General Statutes § 17a-112(j)(3)(B)(ii); see also, e.g., In re Danuael D., 51 Conn.App. 829, 840, 724 A.2d 546 (1999) ("in assessing rehabilitation, the critical issue is . . . whether the parent has . . . gained the ability to care for the particular needs of the child at issue"). In the present case, the petitioner commenced termination proceedings only after multiple service providers, including the intensive family reunification program worker, recommended against reunification due to the respondent's inability to parent G. Nevertheless, the department continued to provide the respondent with *941 parenting instruction and supervision services via Nutmeg Family Services, LLC, until trial. Nutmeg Family Services, LLC, in total provided twenty-five months of parenting instruction to the respondent.
As we previously noted, "[r]easonable efforts means doing everything reasonable, not everything possible." (Internal quotation marks omitted.) In re Samantha C., supra, 268 Conn. at 632, 847 A.2d 883. Examining the department's efforts in light of the particular circumstances of the present case, we conclude that there was adequate evidence from which the court reasonably could have concluded that the department made reasonable efforts to reunify the respondent with G. That determination is not clearly erroneous.

II
We likewise reject the respondent's ancillary contention that the court failed to make its reasonable efforts finding pursuant to the clear and convincing evidence standard. In support of that claim, the respondent isolates the following portion of the court's memorandum of decision: "Finding regarding whether the department. . . has made reasonable efforts to reunite the family pursuant to the federal Child Welfare Act of 1980, as amended: [The department] was found by this court to have made such reasonable efforts as recently as July 31, 2007, and this court finds that [the department has] made reasonable efforts to the present." A review of the court's decision in its entirety indicates that that determination was made under the clear and convincing evidence standard.
As this court recently noted, a trial court may "state explicitly, or implicitly, in its decision" which standard of proof it applies to a given claim. Kaczynski v. Kaczynski, 109 Conn.App. 381, 390, 951 A.2d 690, cert. granted on other grounds, 289 Conn. 929, 958 A.2d 158 (2008). The only standard of proof referenced in the court's memorandum of decision is the clear and convincing evidence standard, and it is referenced repeatedly.[4] Reading the memorandum of decision in its entirety persuades us that the court applied the clear and convincing evidence standard in evaluating the department's efforts at reunification.
Furthermore, to the extent that the respondent now complains that the memorandum of decision is ambiguous as to the standard of proof applied by the court, it was incumbent on her to seek articulation of that issue. Under our rules of practice, it is the sole responsibility of the appellant to provide this court with an adequate record for review. Practice Book § 61-10. Practice Book § 66-5 permits an appellant to seek an articulation by the trial court of the factual and legal basis on which it rendered its decision. "[A]n articulation is appropriate where the trial court's decision contains some ambiguity or deficiency reasonably susceptible of *942 clarification. . . . An articulation may be necessary where the trial court fails completely to state any basis for its decision. . . or where the basis, although stated, is unclear. . . . The purpose of an articulation is to dispel any . . . ambiguity by clarifying the factual and legal basis upon which the trial court rendered its decision, thereby sharpening the issues on appeal." (Citations omitted; internal quotation marks omitted.) Fantasia v. Milford Fastening Systems, 86 Conn.App. 270, 283, 860 A.2d 779 (2004), cert. denied, 272 Conn. 919, 866 A.2d 1286 (2005). "[W]e will, in the absence of a motion for articulation, assume that the trial court acted properly." (Internal quotation marks omitted.) Berglass v. Berglass, 71 Conn.App. 771, 789, 804 A.2d 889 (2002). The respondent did not request an articulation in the present case.
Finally, our conclusion that the court implicitly applied the clear and convincing evidence standard in its memorandum of decision is confirmed by the court's accompanying order dated April 18, 2008, terminating the respondent's parental rights as to G. That order states in relevant part: "At a session of the Superior Court upon notice and hearing on the petition by the party indicated [in this order], requesting that the parental rights of the [respondent] be terminated in conformity with the provisions of the Connecticut General Statutes. . . the court finds clear and convincing evidence that [the department] has made reasonable efforts to reunify [G] with the [respondent]. . . ." Accordingly, we conclude that the respondent's claim that the court failed to make its reasonable efforts finding pursuant to the clear and convincing evidence standard is without merit.

III
The respondent also claims that the court erroneously found that she had failed to achieve a sufficient degree of personal rehabilitation pursuant to § 17a-112(j)(3). We do not agree.
"On appeal, we review a trial court's finding that a parent has failed to rehabilitate herself in accordance with the rules that apply generally to a trier's finding of fact. We will overturn such a finding of fact only if it is clearly erroneous in light of the evidence in the whole record. . . . [G]reat weight is given to the judgment of the trial court because of [the court's] opportunity to observe the parties and the evidence. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [O]n review by this court every reasonable presumption is made in favor of the trial court's ruling." (Citations omitted; internal quotation marks omitted.) In re Eden F., 250 Conn. 674, 705-706, 741 A.2d 873 (1999).
Failure to achieve a sufficient degree of personal rehabilitation is one of the seven statutory grounds on which parental rights may be terminated under § 17a-112 (j)(3). Section § 17a-112(j) permits a court to grant a petition to terminate parental rights "if it finds by clear and convincing evidence that . . . the child . . . has been found by the Superior Court . . . to have been neglected . . . in a prior proceeding. . . and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent . . . and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child. . . ." In making that determination, the proper focus is on the parent's demonstrable development in relation to the needs of the child. As we have observed: "[I]n assessing rehabilitation, the critical *943 issue is not whether the parent has improved her ability to manage her own life, but rather whether she has gained the ability to care for the particular needs of the child at issue." In re Danuael D., supra, 51 Conn.App. at 840, 724 A.2d 546.
"`Rehabilitate' means `to restore [a handicapped or delinquent person] to a useful and constructive place in society through social rehabilitation.' Webster, Third New International Dictionary." In re Juvenile Appeal (84-3), 1 Conn.App. 463, 477, 473 A.2d 795, cert. denied, 193 Conn. 802, 474 A.2d 1259 (1984). Likewise, "[f]ailure to rehabilitate is defined as the failure of a parent to achieve expectations following the adjudication and disposition of the prior neglect petition." In re Jessica M., 49 Conn.App. 229, 248, 714 A.2d 64 (1998), appeal dismissed, 250 Conn. 747, 738 A.2d 1087 (1999). Our review of the record reveals that the evidence credited by the court supports its conclusion that the respondent failed to attain a degree of rehabilitation sufficient to warrant the belief that at some time in the foreseeable future, she would be capable of assuming a responsible position with respect to the care of G.
In its memorandum of decision, the court acknowledged the respondent's compliance with the specific steps, noting the petitioner's concession that the respondent "has displayed a complete willingness to engage in and accomplish all that [the department] feels necessary to successfully parent G. . . ." The court thus found that "[t]he sole issue currently giving rise to the petitioner's request for a termination of [the respondent's] parental rights . . . is her ability or inability to parent safely and consistently." In granting the petition for termination, the court found that "[the respondent's] failures in the area of parenting and retention of lessons once learned, though not wilful, pose a danger to her child were she to attempt to assume the role of primary caregiver to G. . . ." The court therefore concluded that the respondent's inability to parent prevented her from assuming a responsible position with respect to the care of G within a reasonable time.
That finding is supported in the record before us. The court heard testimony from Sheremeta, a social worker with the department. Sheremeta testified that the respondent "has been compliant with the services, but she hasn't been able to learn the parenting skills that she needs in order to care for the child." Sheremeta cited recurring concerns regarding the respondent's parenting ability, including the proper securing of high chair straps, the placement of baby gates on stairs, the respondent's supervision of G in the bathtub and her leaving G unattended in public. As a result, Sheremeta testified, she did not "see a steady progress because some of the concerns are reoccurring, the same issues over and over and over, even though the issues have been addressed with her. So, I wouldn't say there is steady progress."
The court also heard testimony from Mooney of Nutmeg Family Services, LLC, who provided supervised visitation integrated with parenting classes for twenty-five months. Mooney explained that integrated parenting involves "correcting a parent when they do something wrong during a visit or modeling something during a visit that should be done." Its purpose is to "educate a parent in how to properly care for their child." Mooney recounted instances in which the respondent "left [G] in a stroller and walked away" while shopping in public and, like Sheremetal noted safety concerns regarding the placement of baby gates and the securing of high chair straps. As another example of what she deemed inappropriate *944 supervision, Mooney recounted an instance in May, 2007, in which the respondent "had forgotten that there was a visit, and she came down to get [G] out of the car and had left something cooking on the stove, and [upon] returning to the apartment there was a fire and there was smoke everywhere. . . ." Mooney testified that although the respondent was "very open to learning and . . . tries to do what is taught to her," she largely is unable to apply those lessons. On the basis of her firsthand observation and interaction with the respondent over the course of more than two years, Mooney opined at trial that she would not leave G alone with the respondent.
In addition, the April 27, 2007 letter from the intensive family reunification worker at Family Services of Greater Waterbury, Inc., to the department was introduced into evidence. In that letter, Veronneau detailed her observations of the respondent and articulated her concerns that the respondent "is unable to parent by herself" and that she "hasn't shown much improvement or demonstrated strong parenting skills." The court heard testimony that the respondent was discharged from the intensive family reunification program, with the program recommending against reunification of the respondent and G.
Also introduced into evidence was the report of the psychological evaluation ordered by the court. That report stated that the respondent "has clearly made progress in getting her substance abuse under control and in being consistent in following through with recommendations that have been made for her. However, it is the quality of her thinking and affective stability, as well as her significant deficits in interpersonal relating that lead to others' concerns about her ability to be a full-time parent to her daughter. [The respondent] is unlikely to accept that these are legitimate concerns, as she believes that she has complied with what was asked of her. [Despite] the surface changes, however, she is not able to demonstrate the stability and appropriate decision-making to be an appropriate full-time parent to her daughter." The report noted that although the respondent was sexually abused as a child by her older brother, T, she felt "comfortable with him being alone with her children, as she did not believe there was a danger of him hurting them." The report expressed significant concern regarding the respondent's "complete lack of understanding of any potential risk for her children in being exposed to [T], who sexually abused her for years in her childhood.. . . [The respondent] could give no explanation for believing that her brother is not a risk to children, other than to say that she thinks he knows better now." As to her ability to "discharge [child care] responsibilities," the report concluded that "[a]lthough [the respondent] appears to be reasonably stable on the surface, there continue to be significant problems in the quality of her thinking, her social isolation, affective instability, and a lack of insight into her own or her daughter's needs. She may be able to perform basic parenting tasks in a controlled, time-limited setting. However, her ability to maintain appropriate parenting on a more extended basis is limited, [despite] having received extensive treatment and training."
Randall, the clinical psychologist who completed the aforementioned psychological evaluation, also testified at trial. She explained that her psychological evaluation of the respondent included observation of the parent-child interaction between the respondent and G. Randall expressed her expert opinion that the respondent "is not able to be an adequate parent at this time. . . . [Despite] the amount of treatment that she has had, [the respondent] is *945 not able to make appropriate decisions and choices for her daughter. . . ." Asked whether her parenting ability might improve, Randall opined that "it would be very difficult for [the respondent] to make significant improvement in her parenting skills. She has had extensive training in parenting at this point, and I do not believe that she will ever be able to have what would be considered adequate parenting skills to be able to raise a child independently."
In its memorandum of decision, the court found that the respondent, despite her efforts, lacked the requisite ability to care for G properly. Indulging every reasonable presumption in favor of the court's ruling as our standard of review requires, we conclude that the evidence in the record supports the court's conclusion that the respondent failed to attain a degree of rehabilitation sufficient to warrant the belief that at some time in the foreseeable future, she would be capable of assuming a responsible position with respect to the care of G, as required by § 17a-112(j)(3)(B)(ii).
The judgment is affirmed.
In this opinion the other judges concurred.
NOTES
[*] In accordance with the spirit and intent of General Statutes § 46b-142(b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.
[1] The court also terminated the parental rights of G's father, whom we refer to by that designation. Because he has not appealed, we refer in this opinion to the respondent mother as the respondent.

We note also that pursuant to Practice Book § 67-13, the attorney for the minor child filed a statement adopting the brief of the petitioner in this appeal.
[2] The specific steps ordered by the court required the respondent (1) to keep all appointments set by or with the department and to cooperate with department home visits, announced or unannounced, and visits by G's court-appointed attorney or guardian ad litem; (2) to keep G's whereabouts and her own whereabouts known to the department, her attorney and the attorney for G; (3) to submit to substance abuse assessment and to follow recommendations regarding treatment; (4) to submit to random drug testing, the time and method of which shall be at the department's discretion; (5) to engage recommended service providers for parenting and individual counseling; (6) to cooperate with court-ordered evaluations or testing; (7) to sign releases authorizing the department to communicate with service providers to monitor attendance, cooperation and progress toward identified goals, and for use in future proceedings before the court; (8) to have no substance abuse; (9) to have no further involvement with the criminal justice system; (10) immediately to advise the department of any changes in the composition of the household to ensure that the health and safety of the child is not compromised; (11) to visit G as often as the department permits; and (12) to participate in substance abuse and parenting classes through the department of correction.
[3] Although the respondent argues that the department should have offered her therapy in light of the sexual abuse she suffered as a child at the hands of an older brother, the record reveals that the respondent was provided therapy services through the Morris Foundation intensive outpatient pro gram, which offered mental health services. Similarly, her allegation that the department should have reevaluated her medication overlooks the fact that the respondent received medication management services from St. Mary's Behavioral Health Center, which continued to trial.
[4] The memorandum of decision includes the following determinations: "The court finds the following facts by clear and convincing evidence"; "[t]he court finds by clear and convincing evidence that [G] has been found in a prior proceeding . . . to have been neglected and [that the respondent] has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, she could assume a reasonable position in the life of the child"; "[t]his court finds by clear and convincing evidence that it is in the best interest of [G] that [the respondent's] parental rights [as] to her . . . be terminated"; and "[b]ased upon all of the facts noted [previously], which have been found by clear and convincing evidence, the court finds that it is in [G's] best interest to terminate the parental rights of [the respondent]."