IN RE LUCIANO B.*
(AC 32601)
(AC 32602)

Beach, Bear and Flynn, Js.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

450

Argued March 7—officially released June 14, 2011

*Dana M. Hrelic*, with whom were *Brendon P. Levesque* and, on the brief, *Michael S. Taylor*, for the appellant (respondent father in AC 32601).

*David B. Rozwaski*, for the appellant (respondent mother in AC 32602).

*Renee Bevacqua Bollier,* assistant attorney general, with whom, on the brief, were *George Jepsen,* attorney general, *Richard Blumenthal,* former attorney general, and *Susan T. Pearlman* and *Benjamin Zivyon,* assistant attorneys general, for the appellee (petitioner in both cases).

*Shawn Mark O'Neill,* for the minor child in both cases.

*Opinion*

BEACH, J. In this consolidated opinion, the respondent mother and the respondent father appeal from the judgment of the trial court terminating their parental rights with respect to their minor child, Luciano. In docket number AC 32601, the father claims that the court erred in finding that (1) the department of children and families (department) had made reasonable efforts to reunite him with Luciano and (2) he had failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time he could assume a responsible position in the child's life. In docket number AC 32602, the mother claims that the court erred in finding that (1) the department had made reasonable efforts to reunite her with Luciano, (2) she had failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time she could assume a responsible position in the child's life and (3) it was in Luciano's best interest to terminate her parental rights. We affirm the judgment of the trial court.

The trial court found the following facts. Luciano was born in April, 2008. Both Luciano and the mother tested positive for cocaine upon his birth. On May 16, 2008, the petitioner, the commissioner of children and families (commissioner), filed a petition for neglect and an ex parte motion for temporary custody concerning Luciano. On that same date, the court found that

Luciano was in immediate physical danger from his surroundings and vested his temporary care and custody in the commissioner. On May 23, 2008, the court sustained the ex parte order of temporary custody. The issues leading to the filing of the neglect petition included the mother's substance abuse issues as well as a history of domestic violence, including, but not limited to, an incident in which hospital staff saw the father shove the mother while she was holding Luciano, who, at the time, was a little over two weeks old.

The mother has severe and long-standing substance abuse issues intertwined with a history of being involved with violent men. A past relationship was marked by her use of cocaine and by domestic violence. The father has a criminal history, which began in 1982 and includes, among other things, arrests for domestic violence. The couple's relationship was marked by domestic violence. In September, 2007, a criminal court issued a full protective order for the mother, but in April, 2008, the order was downgraded to a partial protective order, which allowed the parents to live together.

On July 17, 2008, Luciano was adjudicated neglected and committed to the custody and guardianship of the commissioner. On that date, the court reaffirmed the specific steps for possible reunification that had been ordered on May 23, 2008, following the hearing on the order of temporary custody. Among other things, the steps required the mother to attend counseling to address depression, substance abuse and domestic violence issues. The father was also required to cooperate with a substance abuse evaluation and to address issues of domestic violence.

The father was referred for a substance abuse evaluation in May, 2009, which he attended briefly. He was asked to leave because he had intimidated the staff.

Although his urine screen came back negative for substances, the father's evaluation was never completed. The father was also referred to a twenty-six week program at the Non Violence Alliance (alliance). The father, however, attended only six weeks before he was incarcerated in August, 2008, following arrests for violation of a protective order relating to a former wife. While incarcerated, the father became ineligible for services offered by the department of correction as a result of an altercation with another inmate. As a result, he did not begin a six week domestic violence class entitled "Embracing Fatherhood" until May, 2009. At about this time, the commissioner filed the petition to terminate parental rights. The father was released on July 31, 2009, and agreed to participate in the more intensive domestic violence program offered by the alliance.

The mother was referred to the Hospital of Saint Raphael for intensive outpatient treatment, but she missed three appointments in part because of the hospitalization of one of her other children. In July, 2008, the department then referred her to Crossroads for inpatient treatment to address her mental health and substance abuse issues, but she missed that appointment. Although the mother received methadone maintenance at the APT Foundation starting in August, 2008, she was not receiving counseling adequate to meet her needs. When the department made another referral for the mother in September, 2008, to Crossroads, she again missed her appointment. After the third referral to Crossroads in October, 2008, the mother entered the program at the Amethyst House. After spending twenty days in the program, she left because she had violated program rules. Although the program was willing to accept her back, she refused to return and was unwilling to resume inpatient treatment at any other facility.

Also in October, 2008, the mother was evicted from the home she shared with the father; as noted above,

he was incarcerated in August, 2008. If she had stayed with the Crossroads/Amethyst House inpatient treatment program, however, she could have received transitional housing services. Instead, she remained transient, living with family and friends while she sought intensive outpatient treatment at Grant Street Partnership. If she had been able to demonstrate ninety days of being free from substance abuse, she would have then been eligible to apply for the supportive housing program. On January 15, 2009, however, she tested positive for cocaine. On February 27, 2009, she again tested positive for illegal substances, this time for morphine. In March, 2009, the mother again tested positive for cocaine, and, as such, she was discharged from Grant Street Partnership for noncompliance.

By the time the commissioner had filed the termination of parental rights petition in May, 2009, the father was still incarcerated and had failed to take advantage of even the limited services available from the department of correction due to an altercation with an inmate. The mother had continually tested positive for illegal substances or was not in consistent treatment or both. She was again unemployed and had no stable or appropriate place to live. Luciano had been in foster care since birth and was, at this point, one year old.

In July, 2009, however, the mother finally managed to remain substance free for three months. She had secured a job and had been attending Harbor Health Services for intensive outpatient treatment following a referral by the department. Her attendance, however, declined as she worked more hours. On July 31, 2009, the father was released from incarceration, and he and the mother resumed living together.

In September, 2009, Nancy A. Randall, a psychologist, interviewed the parents pursuant to a court-ordered evaluation. Randall recommended that the parents be

given no more than three additional months to comply strictly with her treatment recommendations. She noted that the mother was making some progress toward emotional stability and sobriety. Randall observed that the father had only been recently released from his incarceration, but, thus far, had not demonstrated any problems. While endorsing continued reunification efforts for the next three months, Randall insisted that both parents needed to demonstrate a commitment to ongoing treatment. Randall considered the father to be at a continued risk for domestic violence because of his history of such violence and his failure to address these issues adequately in treatment services. Randall recommended that the father attend weekly individual therapy sessions to deal with domestic violence, anger management, judgment and interpersonal issues. Randall recommended that the mother receive continued treatment for substance abuse and other mental health treatment. Randall concluded by suggesting that if both parents strictly complied in the next three months with all treatment recommendations, then visits with Luciano should be upgraded to unsupervised visits at the end of three months. If there were continued compliance and no indications of substance abuse, domestic violence or issues with visitation, reunification could occur within the following three months. Because of Randall's recommendations, the commissioner agreed to reschedule the trial date of October 15, 2009. The parties agreed to reschedule the trial to January 28, 2010.

The father attended two sessions of the alliance program in October, 2009, but then lapsed for several months. In November, 2009, his father died, and he did not attend the alliance program in November. He went to two sessions in December, 2009, and did not attend in January, 2010. He went back to the program, however, and by May 5, 2010, he had attended all but one session of the alliance program.

The mother was referred to State Street Counseling Services and began treatment on October 6, 2009. She attended all sessions in October but missed several sessions in November and December, 2009, and January, 2010. As of May 5, 2010, when her counselor, Megan Tredennick, testified at trial, the mother had continued to attend sessions but frequently cancelled and had to reschedule. The mother claimed to have had conflicts with her work schedule, visitation with Luciano and court dates.[1] When the department asked the mother for proof of her employment, she could not provide the department with a reliable telephone number for her employer or documentation regarding her work schedule.

On January 28, 2010, Randall testified at trial that because the parents had not sufficiently complied with her recommendations in the three month period, the time had come for Luciano to be able to live in a permanent environment. She maintained this position even as she acknowledged that there were no known incidents of domestic violence or substance abuse in the three month period. She testified that domestic violence typically does not occur every day but, with increased stressors operating on the parents and inadequate treatment, Luciano would be at risk if he were returned to the parents' care. In Randall's opinion, by giving the parents an extra three months of time to work toward reunification, she was "stretching the limit" as to what was acceptable for Luciano's needs. Randall further testified that children require permanency because it provides them with personal security, allows them to feel safe within their family and allows them to trust their environment.

---

[1] The court did not find the mother's excuses credible in that visitation with Luciano was scheduled weekly and at the same time every week, and court dates are typically scheduled months in advance.

The court found that the department had made reasonable efforts to reunify Luciano with his parents as of the date of the filing of the petition and that the parents had failed to achieve the requisite degree of personal rehabilitation. The court terminated the parental rights of the mother and father after finding that doing so was in Luciano's best interest. This appeal followed.

General Statutes § 17a-112 (j) provides in relevant part: "The Superior Court . . . may grant a petition filed [for termination of parental rights] if it finds by clear and convincing evidence that (1) the Department of Children and Families has made reasonable efforts to locate the parent and to reunify the child with the parent . . . (2) termination is in the best interest of the child, and (3) . . . (B) the child (i) has been found by the Superior Court or the Probate Court to have been neglected or uncared for in a prior proceeding . . . and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent . . . and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ."

"A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights [under § 17a-112 (j)] exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interests of the child. . . .

"Our standard of review on appeal from a termination of parental rights is limited to whether the challenged

findings are clearly erroneous. . . . A finding is clearly erroneous when either there is no evidence in the record to support it, or the reviewing court is left with the definite and firm conviction that a mistake has been made. . . . [G]reat weight is given to the judgment of the trial court because of [the trial court's] opportunity to observe the parties and the evidence. . . . [An appellate court does] not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [Rather] every reasonable presumption is made in favor of the trial court's ruling." (Internal quotation marks omitted.) *In re Sole S.*, 119 Conn. App. 187, 190–91, 986 A.2d 351 (2010).

I

We first address the claims of the father and mother regarding the court's finding that the department made reasonable efforts to reunite them with Luciano.

"In order to terminate parental rights under § 17a-112 (j), the department is required to prove, by clear and convincing evidence, that it has made reasonable efforts . . . to reunify the child with the parent, unless the court finds . . . that the parent is unable or unwilling to benefit from reunification . . . . [Section 17a-112] imposes on the department the duty, inter alia, to make reasonable efforts to reunite the child or children with the parents. The word reasonable is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof. Neither the word reasonable nor the word efforts is, however, defined by our legislature or by the federal act from which the requirement was drawn. . . . [R]easonable efforts means doing everything reasonable, not everything possible. . . . The trial court's determination of this issue will not be overturned on appeal unless, in light of all of

the evidence in the record, it is clearly erroneous." (Internal quotation marks omitted.) *In re G.S.*, 117 Conn. App. 710, 716, 980 A.2d 935, cert. denied, 294 Conn. 919, 984 A.2d 67 (2009). "It is axiomatic that the law does not require a useless and futile act." *In re Antony B.*, 54 Conn. App. 463, 476, 735 A.2d 893 (1999).

A

We first turn to the father's claim that the court failed to consider the department's failure to comply with court-ordered specific steps. Specifically, he argues that the department failed to provide adequate case management services and failed to monitor the father's progress and compliance with the recommended services.[2] We disagree.

When determining that the department made reasonable efforts to reunify the father with Luciano, the court made the following findings. "[The father] was referred for substance abuse evaluation per the court-ordered specific steps but because he was asked to leave due to intimidating behavior, the evaluation was never completed. While he was referred to and began the alliance program for domestic violence, he only completed six weeks before he was incarcerated for one year, from August, 2008, through July 31, 2009, for violating a protective order. While in jail, he had limited opportunities to take advantage of services, such as parenting and domestic violence programs, but because he was involved in an altercation, he became ineligible to participate for 120 days. As such, he did not even begin such programs until May, 2009, when the termination petition was filed."

---

[2] On May 23, 2008, the court, *Conway, J.*, ordered the department, inter alia, to ensure the child's safety and well-being; to develop a periodic treatment-permanency plan and to review it with the father; to provide case management services; and to refer the father to appropriate services and, as otherwise needed, to monitor his progress and compliance.

First, the father claims that his inability to form a particularly strong bond with Luciano for much of his first year did not arise from his unwillingness to visit his son more frequently, but rather from the department's severe limitation on the number of times that the father was allowed to visit with Luciano. The father specifically argues that while he had weekly visits with Luciano prior to incarceration, the department made no efforts to increase this visitation despite the progress being made to strengthen the bond between Luciano and the father. Additionally, he argues, the department did not increase his visitation after he was incarcerated, during which time visitation was on a monthly basis, even though, according to Joshua Fisher, the social worker who brought Luciano to him during that time, the father "did the best he could given the circumstances."

Although the father now argues that the department failed to give him more frequent contact with Luciano, a department social study, dated June 4, 2009, stated that of the twelve weekly supervised visits offered to the father prior to his incarceration, the father attended only five. Fisher testified at trial that after the father was incarcerated, he was offered and accepted visitation on a monthly basis. Fisher further testified that the department could not offer the father more frequent visitation because of Luciano's young age and the "distance and difficulty to get him into the prison system." "[R]easonable efforts means doing everything reasonable, not everything possible." (Internal quotation marks omitted.) *In re G.S.*, supra, 117 Conn. App. 716.

Second, the father argues that there is no evidence in the record to suggest that the department asked him for feedback as to the effectiveness of the alliance program in which he participated prior to being incarcerated. He states that he fully complied with the alliance

program prior to incarceration and that if the department had communicated with him about his experience with the program, the commissioner may not have found it necessary to file the petition to terminate his parental rights during his incarceration and before he had been given an opportunity to re-engage and complete the program. He contends that the department easily could have tailored a plan to accommodate his incarceration.

There is evidence in the record that the department communicated with him regarding domestic violence programs. After attending six weeks of the twenty-six week alliance program, the father was incarcerated as a result of having violated a protective order. Fisher testified that shortly after the father was incarcerated, he advised the father that it would be in his best interest to participate in a domestic violence program while incarcerated. The father, however, became ineligible for services offered by the department of correction as a result of an altercation with another inmate.[3] Fisher testified that during the monthly visits attended by Fisher, the father and Luciano, he discussed with the father at length the need for a higher level of domestic violence treatment, as the alliance program was more intensive than the domestic violence programs that the department of correction was offering. Fisher further testified that he advised the father that it would be preferable to re-engage in the alliance program upon discharge.

With respect to this issue, the father also argues that the department did not take steps to communicate with him concerning what had occurred during the altercation that had prevented him from participating for 120 days in the programs for which he signed up. By the

---

[3] He began a six week domestic violence class in May, 2009, when the commissioner filed the petition to terminate parental rights.

time he was eligible to participate in the programs, the commissioner had already filed the petition to terminate parental rights. He argues that if the department had maintained regular communication with him, it is possible that the commissioner may have waited to file the petition until he had had the opportunity successfully to complete the treatment programs within the department of correction.

There was evidence that the department monitored the father's progress. The department was aware of the incident that had prevented him from participating in treatment programs within the department of correction. Fisher testified at trial that the father had signed up for anger management and fatherhood support programs while incarcerated, but he was unable to participate for some time in those programs because he received "a ticket," the "official reason" for the disciplinary ticket being an altercation with another inmate. He testified that the father's "story" was that he was "minding his own business" when another inmate hit him over the head. Fisher was aware of both versions of the event. Any claim by the father that the commissioner would have waited to file the petition for termination of parental rights until after his incarceration if the department had communicated with him cannot prevail. First, the department had communicated with him, and, second, a claim hypothesizing what the commissioner would have done is speculative. See *In re Samantha S.*, 120 Conn. App. 755, 759, 994 A.2d 259 (2010) (role on appeal not to guess at possibilities), appeal dismissed, 300 Conn. 586, 15 A.3d 1062 (2011).

Third, the father argues that other than the monthly visitation with Luciano, no other case management service was provided to the father during his incarceration and prior to the filing of the petition for termination of parental rights. He argues that Fisher never followed

up with the father to see if he had signed up for programs with the department of correction, as Fisher had advised the father to do; when Fisher was incorrectly informed by prison counselors that the father had not signed up for such programs, he failed to communicate with the father as to why he had not done so. He argues that the failure to request feedback and to maintain communication with him about his progress meant that the monthly visitation he had with Luciano was the only service provided to the father during his incarceration. The father argues that this service alone was not sufficient to satisfy the "reasonable efforts" requirement of § 17a-112 and claims that his situation is similar to that in *In re Vincent B.*, 73 Conn. App. 637, 809 A.2d 1119 (2002), cert. denied, 262 Conn. 934, 815 A.2d 136 (2003).

In *In re Vincent B.*, supra, 73 Conn. App. 645, this court reversed an order terminating a father's parental rights because the department had made "no efforts at reunification at all." In that case, the father voluntarily entered a long-term inpatient substance abuse treatment program, and his participation in the program was successful. Id., 642. While he was in the treatment program, the commissioner filed the petition to terminate his parental rights because of an incident that had occurred in his absence. Id., 643. Based on the department's past experience with the father, in which he failed to benefit from reunification services with respect to his two other children, the department decided not to engage in reunification efforts with the child that was the subject of the termination petition. Id., 642–44. The department believed that efforts at reunification had been exhausted and offered the father the opportunity only to visit with the child. Id. The court concluded that the department's efforts to reunite the respondent and the child were not reasonable under the circumstances of that case. Id., 644. In *In re Vincent B.* the court stated: "[F]rom the evidence before us,

the only request made by the department was that the [father] complete substance abuse treatment. The [father] did so. The department did not make reasonable efforts when it should have done so. In fact, the record reflects that at least as of July, 2000, the department had made no efforts at reunification at all. Although making no efforts to reunify a parent and his or her child may be reasonable in certain circumstances, it was not so in this case." Id., 645.

The circumstances in the present case are significantly different from those in *In re Vincent B.* In the present case, the department did not deny the father reunification services during incarceration. Rather, the record indicates that the department made efforts at reunification while he was incarcerated. Upon the father's entrance into the custody of the department of correction, Fisher advised the father to participate in programs pertaining to domestic violence and fatherhood and to obtain a substance abuse screening because he had not finished such screening prior to incarceration as a result of his intimidating behavior toward the staff. Although Fisher did not testify at trial that he communicated directly with the father regarding whether the father had signed up for such programs while incarcerated, he did testify that he communicated with prison counselors as to that issue.[4] Furthermore, the father had contact with Fisher each month, when he transported Luciano to the father for visitation. Additionally, while incarcerated, the father participated via telephone in an administrative case review in October, 2008.

Fourth, the father argues that the department continued to fail to follow the court-ordered specific steps after the filing of the termination petition. The court

[4] The father, as noted above, was unable to participate in the programs while incarcerated due to an altercation with another inmate.

may consider evidence regarding the progress of reha-
bilitation after the filing of the petition; see, e.g., *In re
Latifa K.*, 67 Conn. App. 742, 747–49, 789 A.2d 1024
(2002); and may consider the specific steps in deciding
whether the degree of rehabilitation has been suffi-
ciently encouraging. See General Statutes § 17a-112 (j)
(3) (B) (ii). As noted above, counseling and monitoring
was provided, and the trial was continued to accommo-
date the effort.

After carefully considering the father's arguments,
we conclude that the court did not err in finding that
the department made reasonable efforts to reunify the
father with Luciano.

B

We next address the mother's claim that the court
erred in finding that the department made reasonable
efforts to reunite her with Luciano. We disagree.

The court found the following. "[The department]
referred [the mother] three times to Crossroads for
inpatient treatment, an appropriate and reasonable ser-
vice given the length of time she has had . . . serious
substance abuse and mental health issues. She was also
referred to the Hospital of Saint Raphael for intensive
outpatient treatment in June, 2008, but missed all three
appointments scheduled for her. She failed to appear
twice for her appointments at Crossroads before she
finally began to comply in October, 2008. When she was
discharged from Crossroads following violation of [its]
no smoking rule and her refusal to return to the pro-
gram, she rejected further inpatient treatment and
attended Grant Street intensive outpatient services. She
was ultimately discharged for noncompliance, having
tested positive throughout her treatment [there], from
January, 2009, through May, 2009. Just prior to the filing
of the termination of parental rights petition, [the
mother] was referred to Harbor Health for intensive

outpatient treatment. [The mother] was also referred to parenting in November, 2008, but failed to attend due to her work schedule."

First, the mother argues that the court failed to take into account her desire to seek treatment. She highlights Fisher's testimony in which he stated that although she missed three appointments with the Crossroads program, he thought she was sincere in wanting to seek treatment. Section 17a-112 (j), however, focuses on whether the department "made reasonable efforts" at reunification, rather than a parent's willingness to reunify.

Second, the mother argues that the court's finding that she had been "discharged" from the Crossroads program "is not entirely correct." She argues that, as indicated by Fisher, she voluntarily left the program because she became upset after an incident in which she lost a privilege due to her having violated the program's rule against smoking. Although the court's use of the term "discharge" may be ambiguous, the court, earlier in its opinion, clearly stated that the mother "left the [Crossroads] program in November, 2008, because she had violated program rules." At any rate, whether the mother was discharged or voluntarily left the program has no bearing, for the purpose of this case, on whether the department made reasonable efforts. The mother had severe and long-standing substance abuse issues. The department made several referrals for the mother for substance abuse treatment. Several referrals were made to the Hospital of Saint Raphael's chemical dependency program, but the mother missed all three appointments scheduled for her. She was also referred three times to the inpatient Crossroads program to address her mental health and substance abuse issues. The mother failed to enter the program on the first two referrals, finally entered on the third, but soon left.

Although the program was willing to accept her again, the mother refused.

Third, the mother argues that the court's finding that she failed to follow through with a parenting program is "not entirely supported by the evidence." She argues that Annette Johnson, a social worker with the department, testified that she referred the mother to a parenting program, but that she did not have confirmation as to whether the mother engaged in that program. The mother argues that there was no other testimony as to any other referrals for parenting education for her, aside from Tredennick's testimony that as part of the mother's treatment, she received counseling on parenting skills.

The evidence shows that the department made reasonable efforts to engage the mother in parenting classes. Johnson referred the mother to a parenting program. Johnson testified that the mother stated that the address given to her by Hill Health was incorrect, but Johnson confirmed with Hill Health that the address she had provided was correct. Johnson again told the mother to return to Hill Health. Johnson, however, testified that she did not know whether the mother attended Hill Health.[5] "[R]easonable efforts means doing everything reasonable, not everything possible." (Internal quotation marks omitted.) *In re G.S.*, supra, 117 Conn. App. 716. The mother was also referred to State Street counseling. Tredennick, who worked at State Street, testified that the mother received counseling on, inter alia, parenting skills, but frequently cancelled or had to reschedule.

---

[5] To the extent that the mother claims that the court erroneously found that she failed to attend parenting programs, that argument is unavailing. The court made no finding, under § 17a-112 (j), that the mother was unable or unwilling to benefit from reunification; thus, our focus under that statutory section is on whether the court properly found that the department made reasonable efforts to reunify the child with the parent. Thus, that factual finding is not relevant to our analysis.

After carefully considering the mother's arguments, we conclude that the court did not err in finding that the department made reasonable efforts to reunify the mother with Luciano.

II

We next address the claims of the father and mother that the court erred when it found that they failed to achieve personal rehabilitation.

"Section 17a-112 (c) (3) (B) [now (j) (3) (B)] requires the court to determine whether the degree of personal rehabilitation . . . encourage[s] the belief that within a reasonable time . . . such parent could assume a responsible position in the life of the child . . . . Personal rehabilitation refers to the reasonable foreseeability of the restoration of a parent to his or her former constructive and useful role as a parent, not merely the ability to manage his or her own life. . . . In conducting this inquiry, the trial court must analyze the respondent's rehabilitative status as it relates to the needs of the particular child . . . . The trial court must also determine whether the prospects for rehabilitation can be realized within a reasonable time given the age and needs of the child. . . . [A] trial court's finding that a parent has failed to achieve sufficient rehabilitation will not be overturned unless it is clearly erroneous . . . ." (Citations omitted; internal quotation marks omitted.) *In re Tremaine C.*, 117 Conn. App. 590, 597, 980 A.2d 330, cert. denied, 294 Conn. 920, 984 A.2d 69 (2009). "In making its determination, the court may rely on events occurring after the date of the filing of the petition to terminate parental rights when considering the issue of whether the degree of rehabilitation is sufficient to foresee that the parent may resume a useful role in the child's life within a reasonable time." (Internal quotation marks omitted.) *In re Sole S.*, supra, 119 Conn. App. 192 n.8.

In its memorandum of decision, when addressing the issue of rehabilitation, the court found the following. "In light of the statutory elements of this ground as well as the case law interpreting it, this court can find by clear and convincing evidence that the petitioner has met her burden as to both parents. The court finds that both parents have had a troubling and long history of domestic violence in their lives and [the mother], in particular, has also had a debilitating substance abuse problem. As noted above, both parents were offered services to address these issues, and, by May, 2009, the father had spent three-quarters of Luciano's first year incarcerated as a result of violating a protective order. While incarcerated, [the father] became ineligible for what limited services were available due to an altercation with another inmate. Upon his release, he completed a parenting program and a six week domestic violence program. As such, he agreed to do the more intensive twenty-six week [alliance] program and was only just starting that program when in September, 2009, Dr. Randall made her recommendations to give both parents three more months to work toward reunification.

"Meanwhile, [the mother] spent her first four months following Luciano's removal missing intake appointments at both the Hospital of Saint Raphael for intensive outpatient treatment and at Crossroads for intensive inpatient treatment for her mental health and substance abuse diagnosis. When she finally entered treatment in October, 2009, she made some progress, until she was found violating program rules and refused to return to inpatient treatment. Although [the department] discussed other inpatient programs, [the mother] decided to enter intensive outpatient treatment at Grant Street Partnership and eventually, after testing positive throughout treatment, was discharged in March, 2009.

"By the time [the mother] had seen Dr. Randall, she had enjoyed some stability and had been substance free for three months. Given the degree to which both parents were both recently stable in September, 2009, but still at high risk of eventually engaging in domestic violence or for [the mother] abusing substances, Dr. Randall recommended that the parents be allowed to demonstrate three months of strict compliance with individual therapy for both parents and substance abuse treatment and relapse prevention for the mother. Dr. Randall testified that their compliance with treatment was critical for parents to demonstrate that they can develop the tools to handle the kinds of stressors that can provoke a relapse or trigger domestic violence. Raising a child was itself a significant stressor, and Dr. Randall was adamant that Luciano would not be safe in their care if they could not demonstrate a commitment to complying with and benefiting from services.

"By the first day of trial on January 28, 2010, which was three months following the rescheduled trial date in October, 2009, the parents clearly failed to follow through with these requirements. [The father] missed all of November's sessions following his father's death in early November and half of December's sessions and attended none in January, 2010. [The mother] missed half of her sessions as well.

"Troubling to Dr. Randall, as well as to this court, is that Dr. Randall's requirement of three months of strict compliance was not terribly onerous. For three months, [the father] was required to attend counseling for domestic violence and other issues once a week; [the mother] was required to attend individual therapy once a week and substance abuse treatment and relapse prevention sessions once weekly. Compared with raising a child full-time, which the parents claim they want, one or two hours a week of treatment seems to be minimally demanding. Coupled with both parents'

admissions to Dr. Randall that they do not see a need for treatment and the degree to which both parents failed to comply and benefit from services in the year before [the commissioner] filed [the] termination petition, this court finds that they have failed to rehabilitate given Luciano's age and critical need for permanency.

"Dr. Randall made clear that not only do the parents need ongoing services to maintain their stability, but that Luciano needs stability and permanency. Her recommendation to give the parents three additional months was in her words, 'stretching the limit' of what was appropriate for Luciano. Their failure to be consistent in their treatment for three additional months, when their future as parents of Luciano was critically at stake, bodes poorly for their ability to be stable, responsible and consistent caregivers for the next sixteen years of his life. The parents' inability to marshal their energies and commit to their own rehabilitation in the first two years of Luciano's life demonstrates a disregard and lack of appreciation for the significance of time in Luciano's life. The court also notes that the parents in early April, 2010, reported to [the department] that they were separated and that the father was living in a hotel. Standing alone, this evidence is not terribly significant. In the context of the overall history of this case, the instability in their relationship is another level of unpredictability, if not volatility, which concerns this court.

"The court also notes that there was evidence that the [department] social worker, Annette Johnson, was followed by the parents while attempting to transport Luciano home after a visit. This incident as described by the social worker was highly credible and not inconsistent with the father's history of violence and intimidation. Moreover, the court finds this evidence not only disturbing but yet another factor that supports this court's findings. . . . As Dr. Randall reiterated, this

well established principle in child protection proceedings requires that Luciano have caregivers who can commit to his needs twenty-four hours a day, and who are willing to make the emotional commitment and connection that is at the foundation of healthy attachments, secure relationships and sound development. By their actions, the parents have demonstrated that they cannot meet their own needs, much less the full-time demands of a young child." (Citations omitted.)

## A

The father contends that the court relied heavily on Randall's recommendation that as of September 24, 2009, both parents should be given "three more months to work toward reunification." The department agreed to extend three more months in which some degree of rehabilitation perhaps could be realized. The termination hearing was rescheduled to January 28, 2010. He argues that he satisfied Randall's recommendations that he "be involved in individual therapy on a weekly basis" and that there be "no further problems with . . . domestic violence," as of the date of the final hearing in the matter on May 10, 2010. The father argues that the court failed to account for the fact that he completed the alliance program on May, 6, 2010; that he successfully completed a substance abuse evaluation and was determined to have no substance abuse issues; and that the record shows no incidents of domestic violence between the father's release from prison and the date of the final hearing.

The father admits that he did not comply with the three month time frame but argues that the time frame was unreasonable under the circumstances. He argues that because he had recently been released from prison and had only just been referred back to the alliance program as of Randall's September, 2009 report,[6] the

---

[6] As a result of Randall's report, Fisher referred the father to the alliance program.

court's implementation of the three month time frame effectively afforded him three total months, rather than three additional months, to comply with Randall's recommendations. As such, the father argues, he was not afforded room for mistakes or for the occurrence of unexpected circumstances such as the death of his father in November, 2009.

We conclude that the trial court's determination that the father had failed to rehabilitate himself is legally correct and factually supported. There was evidence before the court that the time frame suggested by Randall was reasonable. Randall testified that shortly after the father's release from prison, she met with him and thought that he was in need of further treatment because of his ongoing history with domestic violence and the risk for further incidents. She testified that the parents were presenting themselves as an intact family for reunification purposes. Accordingly, in her reunification plan, Randall proposed that both parents be involved in individual therapy on a weekly basis and that as long as they were compliant and there were no further incidents of domestic violence, visits could increase after one month, with reunification within three months.[7] Randall testified that in her professional opinion, if the parents were not compliant within the three month time frame, then it would not be appropriate to extend further time for reunification. Randall admitted that the time frame was abbreviated but stated that Luciano was almost two years old, had been in foster care his entire life and needed stability in his life.

The father argues that circumstances, such as his incarceration and the death of his father, made the three month time frame unreasonable.[8] The court, however,

---

[7] Randall also recommended that the mother be involved in substance abuse treatment.

[8] The father also argues that the court erred in considering the father and mother together, and while three months may have been reasonable for the mother, it was not reasonable for the father. Fisher testified that upon the

relied on Randall's testimony that the three month time frame was reasonable given the age and needs of Luciano. The age and needs of the child are appropriate considerations when determining whether a parent has achieved the necessary degree of personal rehabilitation. *In re Tremaine C.*, supra, 117 Conn. App. 597. To the extent that this argument is one of credibility, the father cannot prevail. "It is axiomatic that the trial court, as trier of fact, is in the best position to judge the credibility of witnesses." (Internal quotation marks omitted.) *In re John G.*, 56 Conn. App. 12, 19, 740 A.2d 496 (1999). "The psychological testimony from professionals is rightly accorded great weight in termination proceedings." (Internal quotation marks omitted.) *In re Kezia M.*, 33 Conn. App. 12, 22, 632 A.2d 1122, cert. denied, 228 Conn. 915, 636 A.2d 847 (1993).

The father, admittedly, failed to comply during the time frame, and the three month time frame was not the only reference point. The father has a lengthy criminal history that includes, among other things, multiple arrests for domestic violence. Shortly after Luciano's birth, the department invoked an administrative hold on him because, inter alia, hospital staff witnessed the father shoving the mother while she was holding Luciano, who was approximately two weeks old. The father was unable to finish a substance abuse evaluation in May, 2009, because he had intimidated the staff. He was incarcerated in August, 2008, for violating a protective order pertaining to a former wife. While in prison, he was involved in an altercation with another inmate and thus was unable to avail himself of services within the department of correction for 120 days. When the father was afforded three additional months, following

father's release from prison, it was suggested that they pursue reunification on an individual basis but that the parents decided to do so jointly. Randall testified that the parents presented themselves as an intact family for reunification purposes. Thus, her plan for reunification involved both parents.

his release from prison, to work toward reunification he was unable to comply. Randall noted that she made minimal recommendations for reunification services because she understood that the parents had work and other obligations. The father was required to attend therapy sessions once weekly for domestic violence and other issues. The court and Randall recognized that three months of strict compliance was not terribly onerous. The father, however, attended none of the sessions in November following his father's death,[9] attended half of the sessions in December and attended none of the sessions in January. The court concluded that compared to raising a child full-time, the one or two hours per week of treatment seems minimally demanding.

The father argues that the fact that he complied by the date of the final hearing in May, 2010, renders the court's finding that he had failed to rehabilitate erroneous. Despite the father's recent strides, he failed to comply with Randall's recommendation within the time frame she determined was appropriate given Luciano's age and needs. "[I]n assessing rehabilitation, the critical issue is not whether the parent has improved her ability to manage her own life, but rather whether she has gained the ability to care for the particular needs of the child at issue." (Internal quotation marks omitted.) *In re Shyliesh H.*, 56 Conn. App. 167, 180, 743 A.2d 165 (1999). The court concluded that the failure of the parents "to be consistent in their treatment for three additional months, when their future as parents of Luciano was critically at stake, bodes poorly for their ability to be stable, responsible and consistent caregivers for the next sixteen years of his life. The parents' inability to

---

[9] The court credited Randall's testimony that she did not excuse the father's failure to comply due to the death of his father. According to Randall, the program could have provided support at the time of loss.

marshal their energies and commit to their own rehabilitation in the first two years of Luciano's life demonstrates a disregard and lack of appreciation for the significance of time in Luciano's life." The court further noted that in early April, 2010, the parents were separated and the father was living in a hotel. The court concluded that in the context of the overall history of the case, this indicates a continued instability in their relationship.

We therefore conclude that the court did not err in finding that the father had failed to achieve such degree of personal rehabilitation that would encourage the belief that within a reasonable time, considering the age and needs of Luciano, he could assume a responsible position in the child's life.

### B

The mother argues that the court improperly focused on her prior history of noncompliance and failed to focus on the progress she had made toward reunification. She argues that she referred herself for methadone treatment and was compliant with weekly attendance and treatment; upon leaving the Crossroads program sought out and attended outpatient treatment; produced fourteen consecutive clean urine screens from November, 2008, to January, 2009; received negative results for a hair test in 2009; began individual counseling in 2009 and was making steady progress; testified that as of the date of the final hearing in May, 2010, she had been drug free for at least one year and three and one-half months.

We disagree with the mother's argument that the court failed to give proper weight to her progress or that it improperly considered her past history. The court took into account and discussed the mother's progress in its decision. See, e.g., *In re Jennifer W.*, 75 Conn. App. 485, 499, 816 A.2d 697 (court inquired into full

history of respondent's parenting abilities although respondent made significant strides in drug rehabilitation in year preceding termination proceedings), cert. denied, 263 Conn. 917, 821 A.2d 770 (2003). Although the mother highlights the efforts and strides that she has made, "[l]amentably, motivation to parent is not enough; ability is required. . . . [I]n assessing rehabilitation, the critical issue is . . . whether the parent has . . . gained the ability to care for the particular needs of the child at issue . . . ." (Citations omitted; internal quotation marks omitted.) *In re G.S.*, supra, 117 Conn. App. 718.

The court noted that by the time the mother met with Randall in September, 2009, she had enjoyed some stability and was substance free for three months.[10] The court relied on the time frame suggested by Randall for full compliance. Given the parents' recent stability, but high risk of relapse, Randall recommended that the parents be allowed to demonstrate three months of strict compliance with individual therapy for both parents and substance abuse treatment and relapse prevention for the mother. Randall noted that giving the parents three additional months was "stretching the limit" of what was appropriate for Luciano.[11] As of the first day of trial in January, 2010, the mother had failed to follow through with this requirement and had missed half of her sessions. The court noted that the requirement of weekly individual therapy and weekly substance abuse treatment was not "terribly onerous." The

[10] The court apparently credited Randall's testimony and discredited the mother's testimony that as of May, 2010, she had been drug free for at least one year and three and one-half months.

[11] "In conducting this inquiry, the trial court must analyze the respondent's rehabilitative status as it relates to the needs of the particular child . . . . The trial court must also determine whether the prospects for rehabilitation can be realized within a reasonable time given the age and needs of the child." (Internal quotation marks omitted.) *In re Jennifer W.*, supra, 75 Conn. App. 499–500.

court found that the mother was not able to be consistent in treatment for three additional months, when her future as Luciano's parent was at stake. The mother's failure to comply with Randall's minimal requirements caused the court to conclude that she could not meet the full-time demands of a young child.

We therefore conclude that the court did not err in finding that the mother had failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of Luciano, she could assume a responsible position in the child's life.

### III

We last address the claim by the mother that the court erred in finding, during the dispositional phase, that it would be in the child's best interest to terminate her parental rights. We disagree.

"In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the father's parental rights is not in the best interests of the child. In arriving at this decision, the court is mandated to consider and make written findings regarding seven factors delineated in [§ 17a-112 (k)]. . . . The best interests of the child include the child's interest in sustained growth, development, well-being and continuity and stability of its environment. . . . As with the findings made in the adjudicatory phase, we reverse the court's determination of the best interest of the child only if the court's findings are clearly erroneous." (Citation omitted; internal quotation marks omitted.) *In re Albert M.*, 124 Conn. App. 561, 566, 6 A.3d 815, cert. denied, 299 Conn. 920, 10 A.3d 1050 (2010).

The mother argues that the record establishes that she was steadily making progress toward putting herself

in a position to care for Luciano; both social workers testified that she was attentive and loving toward Luciano; Luciano was able to identify her and was happy to see her; and that Luciano was two years old, thus giving opportunity to effectuate reunification. She argues that there has been no showing that continuing her parental rights would have a detrimental effect on Luciano's best interest.

Although the mother claims that the evidence revealed that Luciano identified her and that she was loving toward him, "[o]ur courts consistently have held that even when there is a finding of a bond between parent and a child, it still may be in the child's best interest to terminate parental rights." *In re Rachel J.*, 97 Conn. App. 748, 761, 905 A.2d 1271, cert. denied, 280 Conn. 941, 912 A.2d 476 (2006). The court found that Luciano is thriving in his foster home, where he has lived since birth, and is beginning to cry when he is separated from his foster parents. The court found that his foster parents are his psychological parents. The court further found that Luciano has a "visiting relationship" with his parents and does not cry when he is separated from them. Although the mother has made progress and her efforts are laudable, the record supports the court's finding that, in light of the entire history, she has made inadequate progress to reach a parenting ability consistent with Luciano's need for safety and permanency. "The balancing of interests in a case involving termination of parental rights is a delicate task and, when supporting evidence is not lacking, the trial court's ultimate determination as to a child's best interest is entitled to the utmost deference. . . . Although a judge [charged with determining whether termination of parental rights is in a child's best interest] is guided by legal principles, the ultimate decision [whether termination is justified] is intensely human. It is the judge in the courtroom who looks the witnesses

in the eye, interprets their body language, listens to the inflections in their voices and otherwise assesses the subtleties that are not conveyed in the cold transcript." (Internal quotation marks omitted.) *In re Davonta V.*, 285 Conn. 483, 497, 940 A.2d 733 (2008).

In its thorough and thoughtful decision, the court found by clear and convincing evidence that the child's best interest would be served by granting the petition to terminate the mother's parental rights. We conclude that the court's findings and conclusions are not clearly erroneous.

The judgment is affirmed.

In this opinion the other judges concurred.