IN RE HARLOW P.*
(AC 35602)

Beach, Sheldon and Dupont, Js.

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued September 16—officially released October 30, 2013**

** October 30, 2013, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

*Alison P. Gaston,* with whom, on the brief, was *Erich H. Gaston,* for the appellant (respondent father).

*Ingrid E. Swanson,* for the appellee (petitioner minor child).

*Jessica B. Gauvin,* assistant attorney general, with whom, on the brief, were *George Jepsen,* attorney general, and *Benjamin Zivyon,* assistant attorney general, for the appellee (Commissioner of Children and Families).

*Opinion*

BEACH, J. The respondent father, Joseph P., appeals from the judgment of the trial court terminating his parental rights with respect to his minor child, H.[1] On appeal, the respondent claims that the court erred in (1) finding that the Department of Children and Families (department) made reasonable efforts to reunify him with H and that he was unable or unwilling to benefit from such efforts, (2) concluding that he failed to achieve a sufficient degree of personal rehabilitation, (3) concluding that terminating his parental rights was in H's best interest, (4) admitting a social study into evidence, and (5) terminating his parental rights on the

---

[1] Gloria Harris, counsel for the petitioner minor child, instituted this termination proceeding against both the mother and the father of the child, naming both as respondents. Although the court terminated the parental rights of both parents, only the father has filed this appeal and, for simplicity, all references to the respondent are to the father.

basis of indigence in violation of his rights to equal protection and due process protected by the fourteenth amendment to the United States constitution. We affirm the judgment of the trial court.

The record reveals the following relevant facts and procedural history. Shortly after H was born in 2009, the Commissioner of Children and Families (commissioner) received a referral from Yale-New Haven Hospital expressing concerns for H's safety. A department social worker interviewed both parents at the hospital. The respondent reported that he was unemployed, used marijuana and benzodiazepines, was receiving substance abuse services, was living at a friend's house, and lacked stable housing. The social worker noted that H's parents failed to follow a safety protocol put in place by the hospital to ensure that H would be safe while in their care. On May 19, 2009, the commissioner filed a motion for an order of temporary custody and a neglect petition. On May 29, 2009, the court granted the order of temporary custody by agreement of the parties.

The court ordered specific steps, which, for the respondent, included engaging in counseling and obtaining adequate housing and a legal income. The respondent signed the form outlining the steps. H was adjudicated neglected and committed to the custody of the commissioner in June, 2011. Gloria Harris, counsel for the petitioner minor child, later filed a petition for termination of the respondent's parental rights with respect to H, pursuant to General Statutes § 17a-112 et seq. On February 13, 2013, the court, *Brown, J.*, terminated the respondent's parental rights with respect to H. This appeal followed. Additional facts will be set forth as necessary.

Section 17a-112 (j) provides in relevant part: "The Superior Court . . . may grant a petition filed [for termination of parental rights] if it finds by clear and convincing evidence that (1) the Department of Children

and Families has made reasonable efforts to locate the parent and to reunify the child with the parent . . . [unless the parent is unable or unwilling to benefit from reasonable efforts], (2) termination is in the best inter- est of the child, and (3) . . . (B) the child (i) has been found by the Superior Court or the Probate Court to have been neglected or uncared for in a prior proceed- ing . . . and the parent . . . has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ."

"A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . In the adjudicatory phase, the trial court deter- mines whether one of the statutory grounds for termina- tion of parental rights [under § 17a-112 (j)] exists by clear and convincing evidence. If the trial court deter- mines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interests of the child. . . .

"Our standard of review on appeal from a termination of parental rights is limited to whether the challenged findings are clearly erroneous. . . . A finding is clearly erroneous when either there is no evidence in the record to support it, or the reviewing court is left with the definite and firm conviction that a mistake has been made. . . . [G]reat weight is given to the judgment of the trial court because of [the trial court's] opportunity to observe the parties and the evidence. . . . [An appel- late court does] not examine the record to determine whether the trier of fact could have reached a conclu- sion other than the one reached. . . . [Rather] every reasonable presumption is made in favor of the trial court's ruling." (Internal quotation marks omitted.) *In*

re Sole S., 119 Conn. App. 187, 190–91, 986 A.2d 351 (2010).

I

The respondent claims that the court erred in finding that the department made reasonable efforts to reunify him with H and that he was unable or unwilling to benefit from such efforts. We disagree.

"In order to terminate parental rights under § 17a-112 (j), the department is required to prove, by clear and convincing evidence, that it has made reasonable efforts . . . to reunify the child with the parent, unless the court finds . . . that the parent is unable or unwilling to benefit from reunification [efforts] . . . . [Section 17a-112] imposes on the department the duty, inter alia, to make reasonable efforts to reunite the child or children with the parents. The word reasonable is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof. Neither the word reasonable nor the word efforts is, however, defined by our legislature or by the federal act from which the requirement was drawn. . . . [R]easonable efforts means doing everything reasonable, not everything possible. . . . The trial court's determination of this issue will not be overturned on appeal unless, in light of all of the evidence in the record, it is clearly erroneous." (Internal quotation marks omitted.) In re G.S., 117 Conn. App. 710, 716, 980 A.2d 935, cert. denied, 294 Conn. 919, 984 A.2d 67 (2009).

The respondent argues that the department's reunification efforts were unreasonably insufficient because (1) he was not involved in "Birth to Three" services given to H to address developmental delays, despite the testimony of Logan Green, a court-appointed psychologist, that some type of services that focused on H's developmental issues should have been in place

to facilitate reunification, (2) a psychologist was not involved to assist in the reunification process despite the testimony of Ines Schroeder, another court-appointed psychologist, that a psychologist should be involved to help everyone in the reunification process, (3) the respondent and H's mother were not provided with couples therapy, and (4) the department ignored "a myriad of recommendations" made by court-appointed psychologists, such as that the respondent would bene-fit from parenting education, that visitation should be increased from two times per week to three and then should progress to unsupervised full day visits, and that the respondent would benefit from "psycho-education" regarding the impact of disrupted primary bonds between a child and their caregiver.

Relying on evidence contradictory to each of the respondent's claims, the court found that he was offered a variety of services. As to the Birth to Three program, evidence was submitted at trial that the respondent was provided with "explanatory" work sheets from that program detailing the services which were provided to H within the program, such as descriptions of exercises H should perform to help alleviate physical issues related to her developmental delays. Tomi Handy, a social worker with the department, testified that Birth to Three workers filled out the work sheets each week, and that she gave the sheets to the respondent and was willing to assist the respondent with any questions regarding the work sheets.

Second, Schroeder testified that a psychologist's ser-vices would be helpful to the reunification process when the respondent was "stable": that is, when he had stable housing, was consistent with his treatment for substance abuse and had provided consistently negative substance screenings. Schroeder further testified that she was not recommending reunification because the respondent was not stable.

Third, Julie Dixon, a social worker with the department, testified that the department made a recommendation that H's parents participate in couples counseling. She testified that H's parents discontinued couples counseling because they did not think that they had any such issues.

Last, Dixon testified that the respondent's visitation schedule with H was changed from three times per week to twice per week, but for the same total number of hours by agreement of all parties involved. Green testified that he "didn't think it was especially relevant whether [visitation] happened twice a week or three times a week." Dixon also testified that the change to unsupervised visits was reconsidered when H's mother was arrested. Although the department did not follow through with every recommendation made by the court-appointed psychologist, it did offer multiple services to the respondent.

The court found that the department offered the respondent a "plethora" of services designed to achieve reunification. These services included: Safe Families, for substance abuse treatment, parenting, case management services, assistance in obtaining safe and stable housing, and transportation assistance; Coordinating Counsel for Children in Crisis, for domestic violence counseling; Grant Street Partnership, for substance abuse treatment; Integrated Wellness, for mental health services; Southern Connecticut Rehabilitation Center (SCRC), for mental health services; Jewish Family Services, for supervised visitation and parenting counseling. The department also provided the respondent with bus passes, supervised visitation, and case management services. The court credited the testimony of various social workers with the department regarding their efforts to assist the respondent in obtaining appropriate housing; their efforts included driving him to look at

various housing units and providing a list of shelters and referrals to housing services.

The court's finding of reasonable efforts was not clearly erroneous. To the contrary, the record contains ample evidence supporting the court's conclusion that the department made reasonable efforts to provide the respondent with services and opportunities to facilitate his reunification with H.

The respondent also claims that the court erred in determining that he was unable or unwilling to benefit from such efforts. We first note that the department was required to show clear and convincing evidence of only one of the statutory conditions the respondent now challenges. Section 17a-112 (j) provides in relevant part: "The Superior Court . . . may grant a petition [to terminate parental rights] if it finds by clear and convincing evidence that (1) the Department of Children and Families has made reasonable efforts to locate the parent and to reunify the child with the parent in accordance with subsection (a) of section 17a-111b, *unless* the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts . . . ." (Emphasis added.) "Because the two clauses [of § 17a-112 (j) (1)] are separated by the word 'unless,' this statute plainly is written in the conjunctive. Accordingly, the department must prove *either* that it has made reasonable efforts to reunify *or, alternatively,* that the parent is unwilling or unable to benefit from reunification efforts. Section 17a-112 (j) clearly provides that the department is not required to prove both circumstances. Rather, either showing is sufficient to satisfy this statutory element." (Emphasis in original.) *In re Jorden R.,* 293 Conn. 539, 552–53, 979 A.2d 469 (2009). Because we conclude that the court properly found, on the basis of clear and convincing evidence, that the department had made reasonable efforts to reunify the respondent and H, we do not reach his claim

that the court improperly concluded that he was unable or unwilling to benefit from reunification efforts.

## II

The respondent next claims that the court erred in concluding that he failed to achieve a sufficient degree of personal rehabilitation. We disagree.

"Section [17a-112 (j) (3) (B)] requires the court to determine whether the degree of personal rehabilitation . . . encourage[s] the belief that within a reasonable time . . . such parent could assume a responsible position in the life of the child . . . . Personal rehabilitation refers to the reasonable foreseeability of the restoration of a parent to his or her former constructive and useful role as a parent, not merely the ability to manage his or her own life. . . . In conducting this inquiry, the trial court must analyze the respondent's rehabilitative status as it relates to the needs of the particular child . . . . The trial court must also determine whether the prospects for rehabilitation can be realized within a reasonable time given the age and needs of the child. . . . [A] trial court's finding that a parent has failed to achieve sufficient rehabilitation will not be overturned unless it is clearly erroneous . . . ." (Citations omitted; internal quotation marks omitted.) *In re Tremaine C.*, 117 Conn. App. 590, 597, 980 A.2d 330, cert. denied, 294 Conn. 920, 984 A.2d 69 (2009).

In the portion of the court's memorandum of decision addressing the issue of the respondent's rehabilitation, the court made the following findings and conclusions. "[T]he central impediment" to the respondent's ability to reunify with H was his inability to obtain and maintain stable, appropriate housing.[2] The respondent had almost four years in which to address the issues that

---

[2] The court found since H's removal, the respondent had lived at nine different locations and either was evicted from these residences or walked away due to an inability to pay rent.

led to H's removal: substance abuse, mental health, lack of income, and lack of stable housing. Although the respondent made progress in these areas, he had not achieved a sufficient degree of rehabilitation within a reasonable time. The respondent was unsuccessfully discharged from Integrated Wellness because of a lack of compliance with attendance requirements. It was critical for the respondent to stay engaged with counseling sessions to address his anxiety, which he claimed might have triggered his migraine attacks that may have affected his ability to function for several days per month. It was not clear whether the respondent had sufficient income to meet his needs, let alone the needs of H. He testified at trial that he was employed by Elite Landscaping, but provided no proof of employment. The court expressed concerns as to whether the respondent would continue to attend treatment programs for substance abuse and mental health, and to maintain employment. The court noted that H's parents demonstrated some degree of stability for the first time at the end of June, 2012, when they moved into an apartment in New Haven with a friend, Warren S., with whom they planned to share expenses.

The respondent argues that the court's concerns regarding adequate housing and the ability to afford housing expenses do not justify the termination of his parental rights.[3] He contends that he had been sober for

---

[3] The respondent also argues that the court engaged "whether expressly, tacitly, or perhaps even inadvertently" in a "balancing of the utilities" analysis in which it compared the abilities of H's foster parents with those of her biological parents and determined that H's foster parents would be better caregivers and/or providers for H. The record does not demonstrate, however, that the court engaged in such an analysis. "In the absence of any evidence to the contrary, [j]udges are presumed to know the law . . . and to apply it correctly." (Internal quotation marks omitted.) *State* v. *Reynolds*, 264 Conn. 1, 29 n.21, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004). The court expressly stated in its decision that "[t]his court, through this proceeding, will not decide whether the foster parents are suitable adoptive parents."

eighteen months and had been consistent with parental visits from May, 2009, to August 13, 2012, in that he missed only one visit in order to meet with Catholic Family Charities. He claims that he had adequate housing, was employed, and was able to assume a responsible position in the care of H, with appropriate support systems.

The court did not discount the progress made by the respondent, but rather concluded that despite the progress he had made with respect to issues of substance abuse, mental health, lack of income, and stable housing, he nonetheless had not achieved a sufficient degree of rehabilitation within a reasonable time. "[I]n assessing rehabilitation, the critical issue is not whether the [respondent has] improved [his] ability to manage [his] own life, but rather whether [he] has gained the ability to care for the particular needs of the [children] at issue." (Internal quotation marks omitted.) *In re Sarah Ann K.*, 57 Conn. App. 441, 448, 749 A.2d 77 (2000).

Despite the respondent's having a place to live with Warren S.,[4] there was evidence to support the court's

_____

[4] The respondent argues: "In determining that [the respondent] failed to rehabilitate, the court stated, '[t]he court is concerned as to the need for the parents to obtain the services of Catholic Family Charities . . . as well as Warren S. to pay for the rent and the security deposit on the [New Haven] apartment.' . . . Rehabilitation . . . does not require a parent to assume full responsibility for a child, without the aid of available support systems." (Citation omitted; internal quotation marks omitted.) He argues that receiving financial assistance from Catholic Family Charities and Warren S. for rent payment is not dispositive of his rehabilitative status.

The respondent correctly argues that, by itself, reliance on support systems is not inconsistent with rehabilitation. *In re Migdalia M.*, 6 Conn. App. 194, 203, 504 A.2d 533 ("[p]ersonal rehabilitation . . . does [not] require the parent to be able to assume full responsibility for a child, without the use of available support programs" [citation omitted; internal quotation marks omitted]), cert. denied, 199 Conn. 809, 508 A.2d 770 (1986). The respondent, however, takes the court's quotation regarding rent assistance in this case out of context. The court did not base its conclusion regarding failure to rehabilitate on the respondent's receiving financial assistance. The court's comment was made in the context of assessing the credibility of the

conclusion that his housing was not stable. The court concluded that pursuant to the lease agreement for the New Haven apartment, the landlord rented the apartment only to Warren S., who was solely responsible for the rent. The court determined that Warren S. permitted the respondent and H's mother to reside in the apartment, but there was nothing to suggest that his generosity need continue. The court noted that it was unclear whether the landlord would permit the respondent and H's mother to continue to reside there if Warren S. did not renew his lease in July, 2013. The court further stated that it was reasonable to assume that the respondent and H's mother were unable to obtain the apartment without the assistance of Warren S., in light of their past history of evictions and lack of stable income.

The respondent and H's mother were evicted from three of the nine residences they had lived in since H's birth because of their reliance on Warren S. to pay rent and his failure to do so. When the respondent was not living with Warren S. or otherwise relying on him to pay rent, the respondent lived in temporary lodging with friends, resided in shelters or was homeless. There was testimony that in May, 2011, during a supervised visit at a prior residence of H's parents and Warren S., H's mother and Warren S. were involved in an altercation concerning finances during which H's mother threw a telephone at Warren S.[5] Handy testified that the department was concerned that the respondent did not think animosity with Warren S. was an issue despite the respondent's "need to be involved [with] what's

parents' statement that together they were earning a total amount exceeding $3000 per month as of February, 2012. The court said, "If the rent was $625 per month, it is unclear why Warren had to pay anything, or why they needed [Catholic Family Charities] to pay any of the expenses in June–July, 2012." The court further questioned the credibility of H's mother's statement that she was earning $2000 per month, particularly in light of attempts to withhold important information regarding substance abuse issues from the court.

[5] H was not present during the altercation.

going on in the home" if he was to reside with H's mother, Warren S., and H. The respondent's history of unstable housing and Warren S.'s history of nonpayment of rent provided an evidentiary basis for the court's conclusion that the respondent would likely not be able, within a reasonable time, to provide stable housing. Green testified that the gains made by H in motor and cognitive abilities could easily be lost if she were placed in an environment with unstable housing.

The court did not base its determination regarding failure to rehabilitate solely on the respondent's inability to maintain or to afford adequate housing. The court also concluded that although it was critical for the respondent to continue to attend individual counseling sessions, he was unsuccessfully discharged from his mental health treatment program because of noncompliance. The court observed that the respondent lost his "take home bottle status"[6] at certain times because of his failure to keep appointments with a substance abuse program.

The court also determined that it was not clear whether the respondent had sufficient income to meet the needs of H. The respondent testified that he received $212 per month in State Administered General Assistance (SAGA) cash assistance, $200 per month in food stamps, as well as "under the table" income from landscape work with Elite Landscaping. Despite the respondent's urging that he had sufficient income to provide for H, Handy testified that the respondent was not able to confirm a source of income by providing a check or other proof. The respondent testified that he was employed under the table as a landscaper, and that he had not had a job "on the books" since before H was

---

[6] The court noted that "take home bottle status" meant that attendance and participation was sufficient to permit him to take medication home for periods of time without having to report to the clinic to receive the medication.

born. According to Dixon's testimony, the respondent reported to her that as of June, 2012, he was no longer working as a landscaper. The court did not view the respondent's uncertain income as dispositive of the element of failing to rehabilitate; rather, in its overall analysis it factored in its concern about whether the respondent had shown sufficient responsibility to pay for his own needs, let alone the needs of H.

We conclude that the court's finding that the respondent failed to achieve a sufficient degree of personal rehabilitation was not clearly erroneous.

### III

The respondent next claims that the court erred in concluding that terminating his parental rights was in H's best interest. We disagree with the respondent.

Section 17a-112 (k) provides in relevant part: "[I]n determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered . . . (2) whether the Department of Children and Families has made reasonable efforts to reunite the family . . . (3) the terms of any applicable court order entered into and agreed upon . . . (4) the feelings and emotional ties of the child with respect to the child's parents . . . (5) the age of the child; (6) the efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future . . . and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child . . . ."

"In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of [the respondent's] parental rights is not in the best interests of the child. In

arriving at this decision, the court is mandated to consider and [to] make written findings regarding seven factors delineated in [§ 17a-112 (k)]. . . . As with the findings made in the adjudicatory phase, we reverse the court's determination of the best interest of the child only if the court's findings are clearly erroneous." (Citation omitted; internal quotation marks omitted.) *In re Albert M.*, 124 Conn. App. 561, 566, 6 A.3d 815, cert. denied, 299 Conn. 920, 10 A.3d 1050 (2010).

The respondent argues that "[i]t is clear that the trial court determined that [H] would be 'better off' with [H's] foster parents." He argues that the court wrongfully compared the resources of the foster parents with the resources of the respondent and H's mother in determining whether termination was in H's best interest. In support of his argument, the respondent refers to the factual background portion of the court's decision in which it notes that Green testified that he considered the material advantages provided by the foster parents as contrasted to those of the respondent and H's mother. Referring to testimony is not the same as endorsing the testimony; it would clearly be inappropriate for such a comparison by itself to affect a court's decision regarding termination of parental rights. The respondent also notes the court's statement of concern as to whether he had sufficient income to meet his own needs, let alone the needs of H if she were returned to his care. As we stated previously, the court's concern regarding the respondent's ability to meet H's needs financially was a factor in the court's determination that the respondent, by not acting responsibly in several areas of his life, had failed to rehabilitate sufficiently. The court's decision does not hold that H was "better off" with the foster parents.

The court did state, in its analysis regarding the best interest of the child, that the parents likely were unable

to address income and housing concerns within a reasonable period of time sufficient to meet H's needs. The question at issue in that discussion was whether the respondent could properly care for H. In its best interest analysis, the court carefully examined each of the factors delineated in § 17a-112 (k), but did not compare the respective resources of the foster parents and the respondent. In the absence of any evidence that the court engaged in such an analysis, we presume that the court knew the law and applied it correctly. See *State v. Reynolds*, 264 Conn. 1, 29 n.21, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004).

The respondent also argues that the court did not give proper consideration to the strong emotional bond between him and H. In the course of its decision, however, the court previously had recognized the bond between H and the respondent and noted that "[i]t is uncontroverted that [H] has strong emotional ties with her biological parents."

The respondent contends that the court ignored the efforts he made toward rehabilitation, including maintaining sobriety and consistent visitation. The court expressly addressed the issue of the respondent's personal rehabilitation and noted the respondent's efforts to attend every visit with H and to address substance abuse issues. The court also noted its concern over the respondent's failure to attend his mental health treatment sessions on a consistent basis, in light of the connection between his stress level and frequent migraine headaches, which, in turn, affected his ability to work and potentially interfered with his ability to care for H properly.

The respondent further argues that "there was evidence that the foster parents interfered with the reunification process," and that the court "should not have

put its imprimatur on the malfeasance of the foster parents." The court appropriately expressed its disapproval of the foster parents' actions in telling H that her name was changed to "Charlotte," and in telling H that she did not have to live with the respondent and H's mother. The court, however, noted that "it does not appear to the court that these actions have interfered with the [respondent's] ability to have a meaningful relationship with [H]. The numerous examples of expressions of [H's] love and affection for the [respondent] . . . is ample evidence that the [respondent has] been able to maintain a meaningful relationship with [his] daughter, despite the actions of the foster parents."

The court examined the seven factors delineated in § 17a-112 (k) and concluded that it was in H's best interest for the respondent's parental rights to be terminated. We conclude that this determination was not clearly erroneous.

## IV

The respondent next claims that the court erred in admitting a social study into evidence. We disagree.

"The trial court's ruling on the admissibility of evidence is entitled to great deference. . . . [T]he trial court has broad discretion in ruling on the admissibility . . . of evidence . . . [and its] ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion." (Internal quotation marks omitted.) *Quaranta* v. *King*, 133 Conn. App. 565, 567, 36 A.3d 264 (2012).

General Statutes § 45a-717 (e) provides in relevant part: "(1) The court may, and in any contested case

shall, request the Commissioner of Children and Families or any child-placing agency licensed by the commissioner to make an investigation and written report to it, within ninety days from the receipt of such request. The report shall indicate the physical, mental and emotional status of the child and shall contain such facts as may be relevant to the court's determination of whether the proposed termination of parental rights will be in the best interests of the child, including the physical, mental, social and financial condition of the biological parents, and any other factors which the commissioner or such child-placing agency finds relevant to the court's determination of whether the proposed termination will be in the best interests of the child. . . . (3) The report shall be admissible in evidence, subject to the right of any interested party to require that the person making it appear as a witness, if available, and subject himself to examination." Practice Book § 35a-9 provides in relevant part that "no disposition may be made by the judicial authority until any mandated social study has been submitted to the judicial authority. Said study shall be marked as an exhibit subject to the right of any party to be heard on a motion in limine requesting redactions and to require that the author, if available, appear for cross-examination."

The respondent argues that the admission of the social study was improper because pages thirteen through twenty-two of the study were written by the petitioner's attorney, Harris.[7] He contends that the pages written by Harris contained factual inaccuracies and that Harris was not subject to cross-examination as required by § 45a-717 (e). We are not persuaded that the admission of the study was in error.

[7] This case presented unusual circumstances, in that the petition was drafted by Harris, the attorney for the minor child. Dixon testified that she followed the ordinary procedure in preparing the study.

The termination of parental rights social study, which was admitted as a full exhibit, contains a section from pages thirteen through twenty-two under the following heading: "Facts in support of TPR. The following are the facts as alleged by the child's attorney who is the petitioner in this matter." At the end of the study, there is a line stating: "Submitted by: Julie Dixon," with Dixon's signature. The study also indicates that it was reviewed by Chrichton Stewart, social work supervisor and approved by Tracy Mello, program manager. Dixon testified that she included in the study a section outlining the factual allegations made by Harris in the petition for termination of parental rights. She testified that she read the petition closely and did not change the wording. She further testified that she prepared, typed, submitted and signed the study.

In ruling on the admissibility of the study, the court reasoned that although Dixon obtained information from various sources, including Harris, Dixon "is the author, she put pen to paper, this is the individual who was called to testify [regarding the study]." The court determined that the issue of possible factual inaccuracies in the study goes to its weight and not its admissibility.

The respondent's position is that he had a right, pursuant to § 45a-717 (e) and Practice Book § 35a-9, to cross-examine the author of the study. Because the "author" of the allegations was an attorney in the proceedings, she could not, for practical purposes, be cross-examined. In that situation, the argument goes, the study should not have been admitted into evidence.

The court did not abuse its discretion in admitting the study as a full exhibit. The court did not err in concluding that Dixon, who signed and prepared the study, was its author and, thus, was the individual who

was subject to cross-examination under § 45a-717 (e).[8] Although Harris was the "author" of the allegations, recitation of the allegations is not the same as accepting them as true. The section at issue was clearly labeled: "facts *as alleged* by the child's attorney"; (emphasis added); and, thus, Dixon was not representing that the allegations were facts as determined by the department. The respondent was able to, and did, extensively cross-examine Dixon regarding the factual allegations, and to offer evidence to refute them. Any alleged inaccuracies in the factual allegations pertained to their weight, not their credibility. See, e.g., *State* v. *White*, 64 Conn. App. 126, 133, 779 A.2d 776 (inaccuracies of exhibit do not raise question of admissibility, but rather weight), cert. denied, 258 Conn. 910, 782 A.2d 1251 (2001). The commissioner, of course, had the burden of proving the allegations by clear and convincing evidence.

V

The respondent claims finally that terminating his parental rights "on the basis of his indigence" violated his rights to equal protection and due process under the fourteenth amendment to the Unites States constitution. The commissioner and counsel for H argue in their respective briefs that these claims are not reviewable on appeal because they were not preserved at trial and that *Golding* review,[9] the rationale for reviewing

---

[8] The respondent also argues that the admission of the social study violated his constitutional right to due process under the fourteenth amendment to the United States constitution because he was unable to cross-examine the "author," Harris. The court did not err in determining that Dixon was the author of the study. Nonetheless, it strains the definition of due process to argue that, in the context of the social study, opposing counsel should be cross-examined regarding factual allegations set forth in the termination of parental rights petition simply because those allegations were contained in a social study. Throughout trial, the petitioner was attempting to prove those allegations by clear and convincing evidence, and the respondent was permitted to cross-examine the petitioner's witnesses.

[9] See *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989).

unpreserved constitutional claims, was not requested in form or in substance in the respondent's main brief. The respondent argues in his reply brief that the claims are reviewable because, pursuant to Practice Book § 60-5, they arose subsequent to trial—in other words, he argues that his claims regarding his indigence initially arose in the trial court's decision.

It is undisputed that the respondent did not raise his constitutional claims at trial and failed to request extraordinary review in the appropriate manner in his main brief. See, e.g., *State* v. *Elson*, 125 Conn. App. 328, 353–54, 9 A.3d 731 (2010) (outlining requirements for sufficiently requesting extraordinary review), cert. granted on other grounds, 300 Conn. 904, 12 A.3d 572 (2011).[10] The question remains whether the claim arose subsequent to trial. Practice Book § 60-5 provides in relevant part: "The court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. . . ."

The respondent was put on notice that obtaining adequate housing and legal income were goals in the reunification process and that his failure to do so could result in termination of his parental rights. See *Intercity Development, LLC* v. *Andrade*, 286 Conn. 177, 189, 942 A.2d 1028 (2008) (because issue set forth at trial, it became party's responsibility distinctly to raise objections at trial). His ability to support H and to provide housing, with the assistance of his support systems, was a central issue throughout the entire process. At trial, Dixon testified regarding the respondent's efforts to obtain stable housing and adequate income, and that she had made numerous referrals in that regard. The respondent sought to show at trial that he had adequate income and stable housing to support H: he testified

---

[10] Although certification to appeal was granted, the Supreme Court has not yet issued a decision in *State* v. *Elson*, supra, 125 Conn. App. 328.

that he did not have stable housing until he moved into the New Haven apartment, and that he received SAGA cash assistance, food stamps, and had an "under the table" landscaping position. Green testified that continued relapses in financial stability posed a problem for creating a stable, healthy, safe, and calm environment within which to raise H. The specific steps, which were signed by the respondent, indicated that he was to "get and/or maintain adequate housing and a legal income." Accordingly, the respondent was aware that his ability to maintain adequate housing and legal income would factor into the court's decision. His claim, therefore, did not "[arise] subsequent to trial. . . ." Practice Book § 60-5.

Moreover, the respondent mischaracterizes the court's decision. The court did not consider indigence, by itself, to be a factor in the decision to terminate the respondent's parental rights. Rather, the court examined the respondent's ability to support H financially and to provide adequate housing for H, a child with developmental delays, in the context of the stability of his support systems, such as Warren S. The court determined not that it was impermissible for the respondent to rely on support systems, but that reliance on Warren S. to assist with rent payments was not likely to create a stable housing environment in the future. For the foregoing reasons, we decline to review the respondent's unpreserved claim.

The judgment is affirmed.

In this opinion the other judges concurred.