******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

IN RE LIL'PATRICK T.*
(AC 45399)

Moll, Clark and DiPentima, Js.

*Syllabus*

The respondent father appealed to this court from the judgment of the trial
court terminating his parental rights with respect to his minor child, P.
He claimed, inter alia, that the trial court incorrectly concluded that the
petitioner, the Commissioner of Children and Families, proved by clear
and convincing evidence that the Department of Children and Families
had made reasonable efforts to reunify him with P, that he was unable
or unwilling to achieve the requisite degree of personal rehabilitation,
and that it was in P's best interest to terminate his parental rights. *Held*:

1. The trial court correctly concluded that the respondent father failed to
achieve a sufficient degree of personal rehabilitation as would encourage
the belief that, within a reasonable time, he could assume a responsible
position in the life of P:

a. The father could not prevail on his challenge to the trial court's
determinations with respect to his drug use: the father admitted to having
smoked marijuana daily through the early stages of the department's
involvement, and he was discharged from a clinic to which he was
referred due to lack of engagement; moreover, the court did not improp-
erly place the burden to provide drug testing on the father, rather, the
court simply found that the father reported that he had stopped daily
marijuana use but had submitted to only one toxicology screen, and the
court did not indicate that it had inferred that the father was hiding drug
use because he had taken only one drug test; furthermore, it was within
the purview of the court to question the father's sincerity given his recent
engagement in services in anticipation of litigation, despite the fact that
he had had two years to participate in such services, and to conclude
that the father's efforts were "too little too late."

b. The father could not prevail on his claim that the record did not
support a finding that he had unresolved mental health issues that served
as a barrier to reunification; in the present case, the trial court found
that it had been determined that the father was dealing with stressors
relating to the removal of P from his custody, the court stated that an
issue for the father was possible mental health issues and found that it
was recommended that he participate in counseling, the court found
that the father did not follow through with a referral to a mental health
clinic, and the court's determination that the father's failure to engage
in services until just before trial was "too little too late" was supported
by the evidence.

c. The record supported the trial court's finding that domestic violence
between the father and the mother was an impediment to rehabilitation:
the father and the mother had engaged in domestic violence on two
occasions when P was present, the father and the mother were arrested
following one such altercation, the father failed to engage in services
for domestic violence treatment and, although the father scheduled an
intake for domestic violence counseling a few days after the trial on the
petition for termination was originally scheduled, the court reasonably
questioned the father's motivation in engaging in services given the timing
of his recent engagement in anticipation of litigation; moreover, the
record supported the court's findings that the father attended about one
half of the available visits with P between December, 2020, and August,
2021, and that during one visit he became verbally aggressive toward
P's foster mother and a social worker, left the visit and did not visit P
for the next two months.

d. The father could not prevail on his claim that his lack of stable housing,
under the facts of this case, was not a ground for termination of his
parental rights, which was based on his claim that the trial court had
suggested that he had moved away from the paternal family home by
choice, rather than as a result of a fire that damaged the home, and that
the court improperly failed to consider the impact of the fire on his
ability to achieve stable housing: the court did not suggest that it viewed

the father's inability to reside in a residence damaged by fire as a choice, and, although the father highlighted the fire as a reason why it was difficult for him to engage in services offered by the department, his failure to engage in services preceded the fire; moreover, despite the father's claim that the court did not acknowledge the difficulties that he experienced as a temporary worker in saving money for rent and a security deposit while also replacing possessions damaged by the fire, the record did not contain evidence of specific difficulties he experienced in achieving stable housing following the fire other than as a reason why he may not be able to reside with his mother, with whom he had a tumultuous relationship, and the evidence demonstrated that both before and after the fire, the father changed his location frequently; accordingly, there was an evidentiary basis for the court's finding that the father would likely not be able, within a reasonable time, to provide stable housing, and the court's determination regarding the father's failure to rehabilitate was not based solely on his inability to maintain adequate housing.

2. The respondent father could not prevail on his claim that the trial court incorrectly concluded that termination of his parental rights was in the best interest of P: the court determined that the seven factors delineated in the applicable statute (§ 17a-112 (k)) weighed in favor of the termination of the father's parental rights and, in reaching that determination, the court stated that the father had not shown a serious interest in addressing issues such as domestic violence, mental health and substance abuse, which it determined were barriers to P's reunification with him, and concluded that the father's willingness to participate in and benefit from services offered by the department was uncertain; moreover, because the father focused solely on the portion of the court's best interest analysis that noted his failure to rehabilitate, for the reasons that this court rejected the father's claim challenging the trial court's conclusion that he failed to rehabilitate, this court rejected his challenge to the court's best interest determination.

3. The trial court did not commit plain error in canvassing the respondent father concerning his right to testify; there is no requirement, contrary to the father's claim, that the trial court specifically canvass him regarding the fact that the right to testify was his alone, rather, the court informed the father that he had the right to testify and questioned him regarding whether he had spoken to his counsel regarding that right, and the court did not state that the father's counsel may usurp that decision but, rather, stated that the decision whether to testify was one that he would make with his attorney.

Argued September 7—officially released October 26, 2022**

*Procedural History*

Petition by the Commissioner of Children and Families to terminate the respondents' parental rights with respect to their minor child, brought to the Superior Court in the judicial district of Hartford, Juvenile Matters, where the court, *Dannehy, J.*, rendered judgment terminating the respondents' parental rights, from which the respondent father appealed to this court. *Affirmed.*

*Matthew C. Eagan*, assigned counsel, for the appellant (respondent father).

*Katherine Blouin*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, and *Evan O'Roark* and *Nisa Khan*, assistant attorneys general (petitioner).

*Opinion*

DiPENTIMA, J. The respondent father, Lil'Patrick T., Sr., appeals from the judgment of the trial court terminating his parental rights with respect to his minor child, P.[1] On appeal, the respondent claims that the trial court (1) incorrectly concluded that he failed to achieve a sufficient degree of personal rehabilitation as would encourage the belief that, within a reasonable time, he could assume a responsible position in the life of P, (2) incorrectly determined that termination of his parental rights was in the best interest of P and (3) failed to canvass him adequately concerning his right to testify on his own behalf. We affirm the judgment of the trial court.

The following facts and procedural history are relevant to this appeal. In December, 2019, P was born prematurely, weighing four pounds, three ounces, and he tested positive for marijuana. Because S, P's biological mother, tested positive for marijuana and had a history of domestic violence,[2] including a May, 2019 incident with the respondent, the hospital notified the Department of Children and Families (department). P was discharged from the hospital six days later to reside with the respondent and S under a safety plan with the department. On January 14, 2020, the petitioner, the Commissioner of Children and Families, filed a motion for temporary custody along with a petition representing that P had been neglected. The court granted the order of temporary custody on January 24, 2020. On January 24, 2020, and on July 22, 2020, the court issued orders of specific steps for the respondent to undertake. On December 14, 2020, the court approved a permanency plan of termination of parental rights followed by adoption. On February 23, 2021, the petitioner filed a petition for the termination of the respondent's parental rights as to P.

On February 3, 2022, the court issued its memorandum of decision terminating the respondent's parental rights as to P. With respect to the adjudicatory phase, the court found, by clear and convincing evidence, both that the department had made reasonable efforts to reunify the respondent with P and that the termination of the respondent's parental rights with respect to P was warranted because of his failure to achieve sufficient personal rehabilitation. In the dispositional phase of the proceeding, the court found, by clear and convincing evidence, that termination of the respondent's parental rights was in P's best interest. This appeal followed.[3] Additional facts will be set forth as necessary.

We first note the following relevant legal principles. "A hearing on a termination of parental rights petition consists of two phases, adjudication and disposition. . . . In the adjudicatory phase, the court must determine whether the [petitioner] has proven, by clear and

convincing evidence, a proper ground for termination of parental rights. . . . In the dispositional phase, once a ground for termination has been proven, the court must determine whether termination is in the best interest of the child." (Internal quotation marks omitted.) *In re Leilah W.*, 166 Conn. App. 48, 66–67, 141 A.3d 1000 (2016).

I

The respondent first claims that the court incorrectly concluded that he failed to achieve a sufficient degree of personal rehabilitation. We disagree.

As clarified by our Supreme Court in *In re Shane M.*, 318 Conn. 569, 587–88, 122 A.3d 1247 (2015), the standard of review of a trial court's determination that a parent has failed to achieve sufficient rehabilitation is as follows: "We have historically reviewed for clear error both the trial court's subordinate factual findings and its determination that a parent has failed to rehabilitate. . . . While we remain convinced that clear error review is appropriate for the trial court's subordinate factual findings, we now recognize that the trial court's ultimate conclusion of whether a parent has failed to rehabilitate involves a different exercise by the trial court. A conclusion of failure to rehabilitate is drawn from both the trial court's factual findings and from its weighing of the facts in assessing whether those findings satisfy the failure to rehabilitate ground set forth in [General Statutes] § 17a-112 (j) (3) (B). Accordingly, we now believe that the appropriate standard of review is one of evidentiary sufficiency, that is, whether the trial court could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify its [ultimate conclusion]. . . . When applying this standard, we construe the evidence in a manner most favorable to sustaining the judgment of the trial court."[4] (Citations omitted; emphasis omitted; internal quotation marks omitted.)

We note the following relevant legal principles. "In the adjudicatory phase of the proceeding, the court must decide whether there is clear and convincing evidence that a statutory ground for the termination of parental rights exists." (Internal quotation marks omitted.) *In re Jennifer W.*, 75 Conn. App. 485, 493, 816 A.2d 697, cert. denied, 263 Conn. 917, 821 A.2d 770 (2003). In the present case, the court determined that the respondent had failed to achieve a sufficient degree of personal rehabilitation pursuant to § 17a-112 (j) (3) (B) (i). "Failure of a parent to achieve sufficient personal rehabilitation is one of six statutory grounds on which a court may terminate parental rights pursuant to § 17a-112. [See General Statutes § 17a-112 (j) (3) (B) (i).] That ground exists when a parent of a child whom the court has found to be neglected fails to achieve such a degree of rehabilitation as would encourage the

belief that within a reasonable time, considering the age and needs of the child, the parent could assume a responsible position in the life of that child. . . .

"Personal rehabilitation as used in [§ 17a-112 (j) (3) (B) (i)] refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . [Section 17a-112] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. . . . [The statute] requires the court to find, by clear and convincing evidence, that the level of rehabilitation [he or she] has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date [he or she] can assume a responsible position in [his or her] child's life. . . . [I]n assessing rehabilitation, the critical issue is not whether the parent has improved [his or her] ability to manage [his or her] own life, but rather whether [he or she] has gained the ability to care for the particular needs of the child at issue." (Citations omitted; internal quotation marks omitted.) *In re Leilah W.*, supra, 166 Conn. App. 67–68.

In the present case, the court determined that the department made reasonable efforts to reunify P with the respondent and that the respondent was unable or unwilling to benefit from efforts to reunify; the respondent does not challenge these findings. The court determined that the failure to rehabilitate ground in § 17a-112 (j) (3) (B) (i) had been established by clear and convincing evidence. Specifically, the court found that the respondent's issues, at the time of removal, were domestic violence[5] with S, abuse of marijuana and lack of stable housing. The court noted that trial was originally scheduled to begin on December 1, 2021, and that, thereafter, the respondent requested new referrals for, and attended an intake at, Wheeler Clinic, which addresses substance abuse and mental health; began Fatherhood Engagement Services, which works to help strengthen bonds between fathers and children and to enhance the level of involvement of fathers in their case planning with the department; and scheduled an intake for domestic violence counseling. The court stated that it "question[ed] the sincerity of [the respondent's] motivation, given the timing of his recent engagement in anticipation of litigation, and considering he had two years to participate in services. In any event it remains too little too late. [The respondent] is in no better position today than at the end of December, 2019, when the child was removed from his care. Considering the age and needs of the child . . . the court finds by clear and convincing evidence that [the respondent] has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, he could assume a reasonable position in the life of the child."

## A

The respondent challenges several of the court's subordinate findings. We first address the respondent's arguments challenging the court's findings regarding marijuana use. In the section of the court's memorandum of decision that sets forth its general factual findings, the court found that the respondent "disclosed to the investigative worker that he uses marijuana daily, which continued through the early stages of [the department's] involvement. He tested positive in December, 2019. He later told [the department] that he stopped in January, 2020, without treatment. A toxicology screen taken by Wheeler [Clinic] shortly thereafter was negative. That was the last screen that he provided." In the section of the decision involving the adjudicatory phase of the proceedings, the court found that the respondent "report[ed] that he ha[d] stopped his daily marijuana use but ha[d] only submitted to one toxicology screen."

The respondent argues that "[t]he trial court's judgment concerning the respondent's marijuana use is not grounded in the facts of the case. The department was responsible for determining the time and method of drug testing with regard to the respondent and it determined that the respondent was compliant with his testing requirements. The trial court incorrectly placed the burden of providing tests on the respondent and suggested in its decision that the respondent was hiding his continued drug use by failing to provide such tests. The only evidence in the case is that the respondent told providers that he was going to stop using marijuana in January of 2020 and that he provided a negative drug screen in April, 2021."

The respondent's argument with respect to the court's determinations of his drug use fails for at least two reasons. First, the evidence supports the court's finding that the respondent's efforts were too little too late. The respondent admitted to having smoked marijuana daily through the early stages of the department's involvement, and the court-ordered specific steps that included the respondent submitting to substance abuse evaluation and following treatment recommendations. In order to address concerns of both marijuana abuse and mental health, the respondent was referred to Wheeler Clinic for an intake, which was conducted in July, 2020, and it was recommended that he participate in individual counseling to help him deal with the stressors caused by the removal of P from his custody. He, however, was discharged from the program in November, 2020, due to lack of engagement. A second intake at Wheeler Clinic was conducted in April, 2021, when it was recommended that he resume individual counseling, but he again was discharged for lack of engagement. He was referred for a third intake in November, 2021, and, at the time of the court's decision, was treating at Wheeler Clinic. Second, contrary to the respondent's

assertion that the court improperly placed the burden to provide testing on him rather than on the department, the court simply found the following: "[The respondent] reports that he has stopped his daily marijuana use but has only submitted to one toxicology screen." There is nothing further in the court's memorandum of decision to indicate that it made an inference that the respondent was hiding continued drug use because he had taken only one drug test.

The respondent points to the testimony of Jennifer Lanza, an integrated health supervisor at Wheeler Clinic, that the respondent seemed to have resolved his prior history of marijuana use. He ignores, however, her additional testimony concerning her "impression . . . that there may be more than what he thought that it was relevant to disclose" and that it "was challenging to get [the respondent] to recognize that treatment would—or him engaging in treatment would—be beneficial to be able to potentially address matters that had come up."

"The ultimate issue the court must evaluate is whether the parent has gained the insight and ability to care for his or her child given the age and needs of the child within a reasonable time." (Internal quotation marks omitted.) *In re Omar I.*, 197 Conn. App. 499, 575, 231 A.3d 1196, cert. denied, 335 Conn. 924, 233 A.3d 1091, cert. denied sub nom. *Ammar I.* v. *Connecticut*, U.S. , 141 S. Ct. 956, 208 L. Ed. 2d 494 (2020). In the present case, the court questioned the respondent's sincerity, given his recent engagement in services in anticipation of litigation despite the fact that he had two years prior to participate in services, and concluded that it remained "too little too late." It was well within the purview of the court to make such determinations. See, e.g., *In re Gabriella A.*, 319 Conn. 775, 790, 127 A.3d 948 (2015) ("[i]t is within the province of the trial court, when sitting as the fact finder, to weigh the evidence presented and determine the credibility and effect to be given the evidence" (internal quotation marks omitted)).

B

The respondent next argues that "[t]he record does not support a finding that [he] has unresolved mental health issues that serve as a barrier to reunification." In support of this argument, he highlights the testimony of Lanza that the respondent did not self-report any mental health symptoms specific enough to satisfy the criteria for a diagnosis and that, based on the respondent's intake session at Wheeler Clinic, it was recommended that he engage in individual therapy as long as he felt it would help him cope with current stressors.

The court found that the respondent made "no complaint of any mental health issues, which was reflected in an evaluation conducted by Wheeler Clinic, but [that]

it was later determined he [was] dealing with stressors around the removal and involvement of [the department].” In its analysis of the respondent’s failure to rehabilitate, the court did not make a specific finding regarding mental health as a presenting issue. In its reasonable efforts analysis, the court stated that a presenting issue for the respondent was “possible mental health issues” and found that, after he was referred to Wheeler Clinic for an intake in July, 2020, it was recommended that he participate in individual counseling to help him deal with the stressors caused by the removal of P from his custody. In its assessment of the respondent’s failure to rehabilitate, the court found that the respondent “did not follow through with . . . Wheeler Clinic for substance abuse and mental health.” The court’s determination that the respondent’s failure to engage in services at Wheeler Clinic until just before trial was to begin was “too little too late” is supported by the evidence, for the reasons we stated previously in this opinion when addressing his argument concerning marijuana use. We additionally note that Lanza testified that the respondent failed to remain in treatment “consistently and long enough thus far to be able to further delve into how it is that certain stressors may be potentially impacting behavior or mental health.” She also testified that it was difficult to conduct an assessment in part due to the respondent’s lack of attendance. The respondent finally engaged in treatment in November, 2021, which was close to the date that trial originally was set to begin. Lanza testified that when the respondent came to the clinic in November, 2021, she diagnosed him with an unspecified adjustment disorder “with the intent to be able to assess further while he’s engaged in treatment.”

C

The respondent next argues that the record does not support a finding that domestic violence between him and S was an impediment toward rehabilitation. The court found that the respondent and S engaged in domestic violence in December, 2019, which began as a verbal altercation and resulted in both “grabbing each other and tussling.” One week later in December, 2019, a verbal altercation between the respondent and S escalated into a physical confrontation. The police were called, but no arrests were made. P was present during each incident. Following a physical altercation on August 9, 2020, both the respondent and S were arrested, and protective orders were issued. The respondent admitted to domestic violence in previous relationships.

The record reflects that the respondent repeatedly failed to engage in services to which he was referred for domestic violence treatment. To address the issue of domestic violence, the department made referrals for the respondent to participate in the Inspire Me pro-

gram and the Intimate Partner Violence-Family Assessment Intervention Response (IPV-FAIR) program. He did not respond to attempts to engage him in the Inspire Me program and, although he attended an intake session at the IPV-FAIR program, he was discharged for failure to attend. The department pursued treatment for the respondent for domestic violence through Radiance Innovation Services, but he did not respond to the first referral in March, 2021, or to the second referral in May, 2021. Following his arrest on domestic violence charges in August, 2020, in compliance with the criminal court order, the respondent participated in a family violence program that was not a clinical program but a group educational program. Finally, the respondent scheduled an intake for domestic violence counseling for December 9, 2021, a few days after the trial was originally scheduled. The court reasonably questioned the respondent's motivation in engaging in services, "given the timing of his recent engagement in anticipation of litigation, and considering he had two years to participate in services." The court determined that, "[i]n any event it remains too little too late."

The respondent contends that he was loving and attentive during his visits with P and that there was no evidence that he was ever aggressive or inappropriate with P. The court found that the respondent attended about one half of the available visits between December, 2020, and August, 2021, and that during a visit on February 18, 2021, he became verbally aggressive toward P's foster mother and a social worker and abruptly left the visit and did not visit P for the next two months. The evidence in the record supports the court's findings. Although the respondent may love P and may not have been aggressive toward P, "[t]he fact that [a parent] may love [a] child does not in itself show rehabilitation," and "motivation to parent is not enough; ability is required." (Internal quotation marks omitted.) *In re Paul M.*, 154 Conn. App. 488, 499–500, 107 A.3d 552 (2014).

### D

The respondent also argues that his "lack of stable housing was not grounds for termination under the facts of this case." He contends that the court's finding that, "[a]fter moving from the family home, [the respondent] has lived with a variety of friends and relatives," suggests that he moved by choice, rather than as the result of a fire that damaged the paternal family home, and that the court improperly failed to consider the impact of the fire on his ability to achieve stable housing.

The court found that, when the department first became involved, the respondent and S resided together at the paternal family home but that, in February, 2021, that residence was damaged in a fire and was condemned. Contrary to the respondent's argument, there is nothing in the court's memorandum of decision to

suggest that the court viewed the respondent's inability to reside in a residence that was damaged by fire as a choice. Although the respondent highlights the fire as a reason why it was difficult for him to engage in services offered by the department, the record reveals that his failure to engage in services was a pattern that preceded the fire. He was referred to Wheeler Clinic for substance abuse and mental health treatment and attended an intake but was discharged for lack of engagement in November, 2020. A March 19, 2021 social study conducted by the department, which was admitted as a full exhibit, indicated that the respondent was referred in January, 2020, to Inspire Me for in-home services and that he did not comply with the services offered. Treatment with the IPV FAIR program was scheduled to begin in June, 2020, but he was discharged from the program for failure to attend.

The respondent highlights the court's finding that he "has a history of employment and is currently working through a temp agency" and argues that the court was unwilling to acknowledge the difficulties inherent in a temporary worker saving first and last month's rent money and a security deposit while also attempting to replace possessions. The respondent did not testify at trial, and the record does not contain evidence of specific difficulties he experienced in achieving stable housing following the fire, other than his tumultuous relationship with his mother. He makes no claim on appeal that the department failed to provide him with adequate services to assist him with respect to his housing situation following the fire.[6] Social studies by the department, which were admitted as full exhibits, demonstrate that both before and after the fire, the respondent changed housing locations frequently. A social study dated October 15, 2020, which was prior to the fire, indicates that the respondent stayed with friends or family, changed his location frequently and intended to move back to the family home once he "settle[d] the protective order with [S]." Another social study dated March 19, 2021, approximately one month after the fire, indicates that the paternal family home was condemned as a result of the fire, that the respondent stayed with friends or family and changed his location frequently, and that his last reported address was at the residence of his father. A social study dated August 26, 2021, approximately six months following the fire, indicates that the respondent "[did] not maintain consistent communication with the department to fully assess th[e] specific step," of getting and/or maintaining adequate housing, and that the last report given to the department indicated that the respondent was staying with friends or family and that he changed his address frequently.

The respondent contends that his plan to assume the lease of his mother's apartment was a reasonable response to economic realities. The court found that the respondent "currently resides with his mother with

whom he has what has been described as a toxic relationship. His plans to assume her lease when she moves out can only be described as speculative and the court attaches no weight to this plan." The court rejected the respondent's plan to assume the lease as not credible on the ground that it was speculative whether the series of events would unfold as the respondent suggested. It was noted in a November 30, 2021 social study addendum, which was admitted as a full exhibit, that the respondent informed the department on November 29, 2021, that he had moved in with his mother. The study concluded that, because he is not on the lease and because he has a "tumultuous relationship" with his mother, "there is [a] concern he could lose this housing without notice." The respondent seeks to have us reassess the evidence, which we cannot do. See *L. H.-S.* v. *N. B.*, 341 Conn. 483, 498, 267 A.3d 178 (2021) (reviewing court does not reweigh evidence to determine if it supports challenged finding).

Nothing in the court's decision suggests that it somehow required the respondent to achieve stable housing without the use of available support systems. "[P]ersonal rehabilitation . . . does [not] require the parent to be able to assume full responsibility for a child, without the use of available support programs." (Internal quotation marks omitted.) *In re Harlow P.*, 146 Conn. App. 664, 675 n.4, 78 A.3d 281, cert. denied, 310 Conn. 957, 81 A.3d 1183 (2013). "In the absence of any evidence to the contrary, [j]udges are presumed to know the law . . . and to apply it correctly." (Internal quotation marks omitted.) Id., 674 n.3. The record provides an evidentiary basis for the court's finding that the respondent would likely not be able, within a reasonable time, to provide stable housing. Additionally, the court's determination regarding the respondent's failure to rehabilitate was not based solely on the respondent's inability to maintain or to afford adequate housing.

The court's subordinate findings are sufficient to establish that the respondent failed to achieve sufficient rehabilitation, despite the evidence of the respondent's eventual participation in programs, which, as the court determined, "was too little too late." See, e.g., *In re Sheila J.*, 62 Conn. App. 470, 481–82, 771 A.2d 244 (2001) (court's determination that respondent failed to rehabilitate sufficiently was proper when court found that respondent's demonstrated efforts were "too little and too late"). In sum, we conclude that the court reasonably could have concluded, on the basis of the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify its ultimate conclusion that the respondent had failed to achieve a sufficient degree of personal rehabilitation as would encourage the belief that, within a reasonable time, he could assume a responsible position in the life of P.

## II

The respondent next claims that the court erred in determining that it was in the best interest of P to terminate his parental rights.

We first set forth the applicable standard of review that governs our analysis of this claim. "[A]n appellate tribunal will not disturb a trial court's finding that termination of parental rights is in a child's best interest unless that finding is clearly erroneous. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [Rather] every reasonable presumption is made in favor of the trial court's ruling." (Internal quotation marks omitted.) *In re Malachi E.*, 188 Conn. App. 426, 443, 204 A.3d 810 (2019). "In the dispositional phase of a termination of parental rights hearing, the emphasis appropriately shifts from the conduct of the parent to the best interest of the child. . . . In the dispositional phase . . . the trial court must determine whether it is established by clear and convincing evidence that the continuation of the respondent's parental rights is not in the best interest of the child. In arriving at this decision, the court is mandated to consider and make written findings regarding seven factors delineated in [General Statutes] § 17a-112 [k]. . . . The seven factors serve simply as guidelines for the court and are not statutory prerequisites that need to be proven before termination can be ordered." (Citations omitted; internal quotation marks omitted.) *In re Victoria B.*, 79 Conn. App. 245, 261, 829 A.2d 855 (2003).

The court determined that the seven statutory factors weighed in favor of the termination of the respondent's parental rights. In reaching that determination, the court stated, inter alia, that the respondent "had not shown a serious interest in addressing" issues such as domestic violence, mental health and substance abuse, which the court determined were "legitimate barriers to the child's reunification with him," and concluded that the respondent's "ongoing willingness to participate in and benefit from those services is uncertain." The respondent argues that the court erroneously concluded that termination was in P's best interest. His argument focuses solely on the court's findings in the best interest analysis regarding the respondent's failure to rehabilitate. As a result, he repeats the same arguments that he made when challenging the court's determination that he had failed to achieve sufficient personal rehabilitation. In his reply brief, the respondent states, "[o]bviously, if this court determines that the trial court erred in determining the respondent failed to rehabilitate, any best [interest] analysis would be superfluous." Additionally, at oral argument before this court, the respondent's counsel acknowledged that the respondent's best interest claim was "essentially the same claim" as his claim regarding the court's conclu-

sion that he had failed to achieve sufficient personal rehabilitation. Because the respondent focused solely on the portion of the court's best interest analysis that noted the respondent's failure to rehabilitate, our analysis as to both claims is similar. For the reasons that we rejected the respondent's claim challenging the court's conclusion that he had failed to rehabilitate, we reject the respondent's challenge to the court's best interest determination.

III

The respondent last claims that the court did not canvass him adequately concerning his right to testify on his own behalf pursuant to *In re Yasiel R.*, 317 Conn. 773, 120 A.3d 1188 (2015). He acknowledges that this claim is unpreserved and seeks reversal under the plain error doctrine. There is no plain error.

"The plain error doctrine is a rule of reversibility reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . . [Thus, an appellant] cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is both so clear and so harmful that a failure to reverse the judgment would result in manifest injustice." (Internal quotation marks omitted.) *In re Miyuki M.*, 202 Conn. App. 851, 858 n.4, 246 A.3d 1113 (2021).

The following additional facts and procedural history are relevant to our review of this claim. Before the start of trial, the court advised the respondent: "You do have the right to testify. That's a decision you make with your attorney. I'm not going to draw any adverse inference from your failure to testify." After the petitioner finished presenting evidence, the following colloquy took place:

"The Court: All right. Thank you. And [the respondent's counsel], do you have any witnesses?

"[The Respondent's Counsel]: No witnesses, Your Honor, and I did discuss my client testifying and he's not testifying. We did have that discussion.

"The Court: And, [respondent], you talked to your lawyer about testifying; is that correct? [Respondent], can you hear me?

"[The Respondent]: Yes, Your Honor.

"The Court: Did your lawyer . . . talk to you about testifying?

"[The Respondent]: Yes, I'm confirming. Yes, Your

Honor."

"Our Supreme Court exercised its supervisory pow-
ers in *In re Yasiel R.* to announce a new rule that,
although not constitutionally required, it concluded was
necessary to protect the perceived fairness of the judi-
cial system with regard to termination of parental rights
proceedings." *In re Leilah W.*, supra, 166 Conn. App.
60. In *In re Yasiel R.*, our Supreme Court held that
"in all termination proceedings, the trial court must
canvass the respondent prior to the start of the trial.
The canvass need not be lengthy as long as the court
is convinced that the respondent fully understands his
or her rights." *In re Yasiel R.*, supra, 317 Conn. 795.
One of the rights that the court must include in its
canvass is "the respondent's right to testify on his or
her own behalf . . . ." Id.

The respondent argues that, "[a]lthough the trial
court informed [him] that he had the right to testify, it
couched the right as 'a decision you make with your
attorney.' . . . [T]he right belongs to the respondent
alone and is not a right that can be usurped or placed
in the hands of counsel. . . . Because neither the . . .
canvass nor the subsequent colloquy concerning the
respondent's right to testify on his own behalf made
clear—as required by our Supreme Court in [*In re*]
*Yasiel R.*—that the right belonged exclusively to the
respondent, the canvass was inadequate."

The respondent's argument is unavailing. He misin-
terprets both the requirements of *In re Yasiel R.*, and
the court's canvass. *In re Yasiel R.*, supra, 317 Conn.
795, requires a trial court to canvass a respondent con-
cerning "the respondent's right to testify on his or her
own behalf . . . ." The court did so in the present case.
There is no requirement under *In re Yasiel R.* that the
trial court specifically canvass the respondent regarding
the fact that the right to testify is his alone. The court
informed the respondent that he had the right to testify
and questioned him regarding whether he had spoken
to his counsel regarding that right. The court did not
state that the respondent's counsel may usurp that deci-
sion but, rather, the court stated, "[t]hat's a decision
*you* make with your attorney." (Emphasis added.) See
*In re Josiah D.*, 202 Conn. App. 234, 257, 245 A.3d
898 ("[i]t is without question that a parent may not be
compelled to testify at a termination of parental rights
trial and need not testify on his or her own behalf"),
cert. denied, 336 Conn. 915, 245 A.3d 424 (2021). There
is no error, much less plain error. Accordingly, we con-
clude that the extraordinary circumstances that would
warrant reversal under the plain error doctrine are not
present.

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142
(b) and Practice Book § 79a-12, the names of the parties involved in this

appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Moreover, in accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018), as amended by the Violence Against Women Act Reauthorization Act of 2022, Pub. L. No. 117-103, § 106, 136 Stat. 49; we decline to identify any person protected or sought to be protected under a protection order, protective order, or a restraining order that was issued or applied for, or others through whom that person's identity may be ascertained.

** October 26, 2022, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The court also terminated the parental rights of the respondent mother, who is not participating in this appeal. Accordingly, we refer in this opinion to the father as the respondent.

[2] S had a history of domestic violence with the respondent, as well as in her prior relationships.

[3] The attorney for the minor child filed a statement adopting the petitioner's brief in this appeal.

[4] The respondent also claims that the standard of review of evidentiary sufficiency established by our Supreme Court in *In re Shane M.*, supra, 318 Conn. 569, is improper and that the proper standard of review for such claims should be clear error. He states that this claim was made only for purposes of preservation and acknowledges that this court does not have the authority to overturn the precedent of our Supreme Court. We agree that we are bound by our Supreme Court's decision in *In re Shane M.*, and, therefore, reject the respondent's standard of review claim. See *State* v. *Henry*, 76 Conn. App. 515, 551, 820 A.2d 1076 ("it is not the province of an intermediate appellate court to overturn the precedent of the jurisdiction's highest court"), cert. denied, 264 Conn. 908, 826 A.2d 178 (2003).

[5] The evidence before the court and the court's memorandum of decision refer to this issue as domestic violence, interpersonal violence and intimate partner violence interchangeably. For ease of reference, we use the term domestic violence.

[6] To the extent that the respondent is attempting to challenge the statutory scheme on the ground that "[t]he inequities of . . . § 17a-112 (j) (3) (B) (i) are directly felt by the working poor," we decline to review that claim because, among other reasons, it is not adequately briefed. See, e.g., *C. B.* v. *S. B.*, 211 Conn. App. 628, 630, 273 A.3d 271 (2022) ("[w]e repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief" (internal quotation marks omitted)).

――――――――――――――――――